## STELLA SMART, Appellant, v. KANSAS CITY.

### In Banc, December 24, 1907.

1. **NEW TRIAL: Grounds Assigned: Others Considered On Appeal.** The court on an appeal from an order granting a new trial, will consider not only the sufficiency of the ground assigned by the trial court, but also any other ground insisted upon by respondent as sustaining the order made; and if the ground assigned is not sufficient, but the others insisted upon are, the order granting a new trial will be affirmed.

2. **PHYSICIAN AS WITNESS: Waiver: By Bringing Suit.** The plaintiff's physician or surgeon is disqualified to testify in behalf of defendant as to all information acquired by him from her in a professional capacity and which was necessary in order to enable him to prescribe for her; and plaintiff does not waive the privilege by bringing suit for damages for personal injuries inflicted upon her through the negligence of defendant. The physician is not competent to testify, where plaintiff claims that her injuries made necessary the amputation of her leg, that prior to the accident she had tuberculosis in the leg, or that he advised amputation; nor does she waive her right, under the statute, to object to his incompetency to so testify, by the fact that she has brought suit for damages for her injuries.

3. ———: **Assistants in Hospital.** Assistant physicians or surgeons in a city hospital to which plaintiff was taken for treatment, are incompetent to testify over her objection as to any matter connected with her treatment or her condition while there. The relation between her and them grows out of a contract, express or implied, and in either case they cannot testify.

4. ———: ———: **Trespasser: Treating Patient Against Will.** The intrusion of a physician or surgeon into a public hospital, and his assumption of authority to observe and examine patients without the permission of those in charge and without the consent of the patients, constitutes him a trespasser. If he was not rightfully there he was not only a trespasser, but was guilty of assault and battery, in approaching the bed of an adult female patient, uncovering her person and examining her knee. But in the absence of evidence showing such intrusion or officiousness, the law will not presume that he was guilty of a crime, but will assume that he was present for an honest purpose, approved by the hospital authorities, and by the implied consent of the patient to receive him as her physician.

*Held,* by **Lamm, J.,** in a dissenting opinion in which **Graves, J.,** concurs, (1), that where plaintiff removes the seal of secrecy and professional confidence from one or more of her physicians, she should be held to have waived it as to all others; that she should not be permitted to call such physicians as she may choose to testify in her behalf, and invoke the statute against other physicians, called by defendant, who had like opportunities of observing her condition; and (2), that the mere voluntary examination of plaintiff's diseased knee by a physician who happened to be in her ward at the time, even if a violation of mere punctilio, did not affect his competency to testify as to the matters he observed.

5. ———: ———: **Charity Patient.** If the physician treats the patient by permission of the hospital authorities, or by consent of the patient, whether a charity or pay patient, the statute places the seal of secrecy upon all information acquired by him in a professional capacity.

6. ———: ———: **Voluntary Examination: Relation to Patient.** Where the physician was rightfully in the public hospital to which plaintiff had been taken for treatment, exercised authority over patients, examined their persons, advised treatment, directed their removal from their wards to the operating room for clinical purposes, all with the knowledge and consent of those in charge of the institution, it will not be presumed that, in approaching her bed, pulling up the covers, exposing her person and making an examination of her knee, he intended to commit

the crime of assault and battery, but, there being no showing to the contrary, it will be held that the relation of physician and patient existed between them, although she was not his patient and he did not and did not intend to treat her. Especially should this be the holding where there is no evidence tending to show that the patient thought or believed otherwise than that he was one of the hospital attaches and as such had the authority to do what he did.

7. ————: ————: ————: Implied Consent of Patient. It is not necessary, in order to create the relation of physician and patient, that he actually treat her. If he makes an examination of the patient, with her knowledge and consent, she believing that the examination is being made with a view to her proper treatment, then the relation is created by implication, and it is wholly immaterial what his secret object or purpose was. In the absence of evidence of her knowledge to the contrary, the patient has the right to assume that a physician who examines her in a public hospital to which she has been taken for treatment has authority to examine and treat her, and if he does either he will not afterwards be heard to say that he had no authority to examine her, but the law will imply the confidential relation to exist, and will not permit him to testify what he observed and discovered by his officious and voluntary examination.

8. ————: ————: Trick or Fraud. The law will not permit the patient's statutory privilege of disqualifying her physician from testifying to be taken from her by any trick or fraud.

9. ————: Hospital Physician: Record of Patient's Condition. A hospital physician who attends a patient at the hospital cannot testify as to what he learned of the patient's condition while so attending her, nor is the official hospital record into which has been copied his diagnosis of the case, competent. That record if made by the physician himself, or by some one else from information given by him, is not competent, but is privileged. Nor is the fact that the city ordinances require such records to be kept any reason why the statute should be violated.

10. EXPERT: Hypothetical Question: Omission of Facts. Where the expert was present during the entire trial except about ten minutes, an objection to a hypothetical question based on what he heard, that it is not based on the entire evidence, should not be sustained if it is apparent that the part of the evidence which the witness did not hear was immaterial to the question.

11. ———: ———: ———: Objection of Immateriality. And even though the evidence that the expert did not hear was material to the hypothetical question, yet if plaintiff offered to read from a deposition for the expert's information that evidence which he had not heard, and defendant objected to it as being immaterial, defendant cannot complain that the question was not based on the entire evidence. Defendant cannot contend that evidence is both material and immaterial.

12. ———: ———: Conclusions of Witness. The expert should not be permitted to say the amputation of plaintiff's leg was made necessary by the accident complained of, where there was much evidence that it was made necessary by tuberculosis. It is for the jury to say which one of the causes made the amputation necessary. The inquiry should be, was the accident a sufficient cause to necessitate the amputation? and limited to that.

13. NEGLIGENCE: Instruction: Coal Hole in Walk. An instruction for plaintiff does not ignore the distance the coal hole extended above the level of the sidewalk which tells the jury, "and if you further find from the evidence that defendant neglected said duty by allowing the covering and lid on said coal hole to be, on the day of the accident, and to remain, for a long time prior thereto, in an unsafe and dangerous condition for travel thereon on account of the covering or lid of said hole extending above the sidewalk." That is a proper instruction where plaintiff's evidence showed the metallic cylinder and lid extended above the level of the sidewalk from two to four inches, and that for defendant that it extended not to exceed three-fourths of an inch.

14. ———: ———: Invited by Appellant. Defendant cannot complain of an error in plaintiff's instructions which it adopted in its own instruction.

15. ———: ———: City: Insurer of Pedestrian's Safety. An instruction which tells the jury that if the city "knew of the defective condition of the sidewalk, or by the exercise of ordinary care could have known thereof in time to have had reasonable opportunity to have repaired it in time to have prevented the accident, but failed and neglected to do so," does not make the city an insurer of the safety of its sidewalks, nor does it require the city to have repaired the sidewalk in time to have prevented the accident to plaintiff.

16. ———: Amputation of Leg: Damages. If the evidence shows that plaintiff's leg was amputated because of the fall due to a defective sidewalk and the consequent injury to the knee cap, it is proper for the jury to consider that fact in estimating her

damages, and it is for them to find whether or not that was a fact. On the other hand, if the jury should find that the amputation was the result of tuberculosis, then the loss due to amputation should not be considered by them in estimating her damages.

17. ———: ———: **Aggravation of Damages: Pleading.** Where the petition alleges that the amputation of plaintiff's leg was caused by a fall received on a sidewalk, an instruction permitting the jury to consider the amputation as an aggravation of existing diseases in the leg is not erroneous.

Appeal from Platte Circuit Court.—*Hon. A. D. Burnes,* Judge.

AFFIRMED.

*Henry J. Latshaw, Jr.,* for appellant.

Information acquired by a physician or a surgeon from a patient while attending him in a professional character, and which information is necessary in order to enable him to prescribe for such patient, is incompetent evidence when objected to by the plaintiff. R. S. 1899, sec. 4659; Smoot v. Kansas City, 92 S. W. 363; Hayworth v. Co., 94 Mo. App. 215; Weitz v. Co., 53 Mo. App. 39. In order to carry out the purpose and the spirit of these statutes, the courts hold this prohibition includes not only the physician in charge of the patient, but it extends to physicians brought in consultation by the physician in charge or by third parties. Renihan v. Dennin, 103 N. Y. 573; Prader v. Accident Assn., 95 Iowa 156; Edington v. Ins. Co., 67 N. Y. 194. And it also applies to a partner of the attending physician, even though said partner in no way prescribes for the patient. Raymond v. Railroad, 65 Ia. 152; Ins. Co. v. Denning, 123 Ind. 384. Dr. Fulton was plaintiff's physician, notwithstanding he was not employed by plaintiff. Grossman v. Supreme Lodge K. & L. of H., 53 Hun (N. Y.) 637; Weitz v. Railroad, 53 Mo. App. 39; Hayworth v. Railroad, 94 Mo. App.

225; People v. Murphy, 101 N. Y. 128; Colorado Fuel
Co. v. Cummings, 8 Col. App. 541; Freel v. Co., 97
Cal. 40; Railroad v. Mushrush, 11 Ind. App. 192; Kiest
v. Railroad, 110 Ia. 32; Raymond v. Burlington, 65 Ia.
152; Gratton v. Co., 24 Hun (N. Y.) 43; Renihan v.
Dennin, 103 N. Y. 573. And this is true even though
the doctor had been called against plaintiff's expressed
desires. Meyer v. Sup. Lodge K. of P., 64 L. R. A.
839. Information, as used in these statutes, includes
knowledge gained by the physician in looking at the pa-
tient or examining the patient, as well as verbal com-
munications between patient and physician. Smoot v.
Kansas City, 92 S. W. 363; Gartside v. Co., 76 Mo.
447; Kling v. Kansas City, 27 Mo. App. 231. The an-
swer of Dr. Jones is not responsive to the question—
clearly not. The question was not, what precipitated
the amputation, nor what caused the amputation, but
simply, and plainly and clearly, what brought that dis-
ease to that particular limb and that particular part of
that limb. The question was for the purpose of get-
ting Dr. Jones to state whether the reoccurrence of
this ailment was due to plaintiff's fall on the sidewalk,
or to some other cause. Dr. Jones did not answer the
question propounded to him, but, on the contrary, an-
swered a very different question. Therefore, appel-
lant says that respondent's proper remedy, and re-
spondent's only remedy, was by motion to strike out
the answer of the witness, as not responsive to the
question. This is the well-settled law in this State,
to which there is no exception. Murphy v. Railroad,
102 S. W. 66; Barr v. Kansas City, 121 Mo. 29; Hol-
lenbeck v. Railroad, 141 Mo. 97; State v. Eisenhour,
132 Mo. 145; Waddell v. Railroad, 113 Mo. App. 687.
Appellant respectfully suggests that this question is
not at issue in this case, for the further reason that
Dr. Jones did not testify the fall caused the amputa-
tion, nor did he use words that can be properly con-

strued to mean that the fall caused the amputation, but he testified to the exact contrary. He said that the injury precipitated the amputation. Precipitation does not mean to cause—it means to hasten; and especially to hasten in an undue or premature manner. Detrich v. Railroad, 102 S. W. 1044. Therefore, it surely cannot be said Dr. Jones testified that the fall was the cause of the amputation.

*Edwin C. Meservey* and *Wm. A. Knotts* for respondent.

(1)    The trial court properly granted a new trial, because said court erred in excluding the testimony of Dr. Fulton. (a)    Because the filing of the petition herein was a waiver of any claim to exemption under section 4659, Revised Statutes 1899. 4 Wigmore on Evidence, p. 3355, secs. 2388, 2389; Cramer v. Hurt, 154 Mo. 112; State v. Depositor, 21 Nev. 107; Becknell v. Hosier, 10 Ind. App. 5; Treanor v. Railroad, 16 N. Y. Supp. 538. (b)    Because Dr. Fulton was not plaintiff's physician and his testimony did not come within the exemption of the statute. Schermer v. McMahon, 39 Mo. App. 36; Henry v. Railroad, 57 Hun 76; James v. State, 102 N. W. 320; Scripps v. Foster, 41 Mich. 748; Estate Freeman, 46 Hun 461; Griffith v. Railroad, 171 N. Y. 106; Lowenstein's Will, 2 Misc. (N. Y.) 325; People v. Koerner, 154 N. Y. 366; People v. Sliney, 137 N. Y. 580; Fisher v. Fisher, 129 N. Y. 655; Brendl Will, 102 Wis. 45. When Dr. Fulton testified in the former trial of this case plaintiff waived any privilege as to testimony contained in bill of exceptions and the trial judge properly granted a new trial for failure to admit same. Elliott v. K. C., 96 S. W. 1023; Webb v. Railroad, 89 Mo. App. 611; Elliott v. Kansas City, 96 S. W. 1023. (2)    Defendant is not precluded from showing by the record here that it was entitled to a new trial, notwithstanding the trial

court only specified one reason for a new trial, when there was other error upon which it would have been proper to have sustained defendant's motion for a new trial. Emmons v. Quade, 176 Mo. 29; Gray v. Railroad, 54 Mo. App. 670; Ittner v. Hughes, 133 Mo. 692. (3) The trial court properly granted a new trial because said court erred in excluding the testimony of Dr. Griffith, Dr. Stanley, Dr. Lane and Dr. Enne, because the testimony of said doctors did not come within the exemption of the statute. When Dr. Griffith testified in the former trial of this case plaintiff waived privilege as to testimony contained in bill of exceptions made at said trial. Elliott v. K. C., 96 S. W. 1023. (4) The trial court properly granted a new trial because said court erred in excluding the testimony of Dr. Frederick, together with the record of the city hospital, showing diagnosis of plaintiff's case entered therein while she was in the said city hospital. 1 Elliott on Evidence (Ed. 1904), p. 742, sec. 635, note 10. (5) The trial court properly granted a new trial because said court erred in refusing to sustain defendant's objections to the testimony of plaintiff's only witness, Dr. Brummel Jones, as to whether or not the injury caused the amputation. (a) The question asked said witness being based upon the evidence of the trial that the doctor heard, when he had not heard all of the testimony in the case. Connell v. McNutt, 109 Mich. 332; Sancher v. People, 22 N. Y. 154. (b) Because said question and answer are the conclusion of the witness, when the question of whether or not the accident produced the amputation was a question for the jury. Glasgow v. Railroad, 191 Mo. 347; Taylor v. Railroad, 185 Mo. 239; Mfg. Co. v. Dorgan, 16 U. S. App. 299; Elliott v. Russell, 92 Ind. 526; Craig v. Company, 98 Ind. 111; Stoddard v. Winchester, 157 Mass. 575; Link v. Sheldon, 136 Mass. 9. (6) The court erred in giving that part of the instruction which per-

mitted the jury to consider the fact that plaintiff's leg was amputated by reason of the accident. Smillie v. St. Bernard Dollar Store, 47 Mo. App. 406; Smith v. Bank, 99 Mass. 605; Searles v. Railroad, 101 N. Y. 661; Bond v. Smith, 113 N. Y. 378; Pauley v. Steam Co., 137 N. Y. 417. (7) This instruction erroneously permitted the jury to consider the aggravation of plaintiff's existing ailments. Watson on Damages (Ed. 1901), sec. 206; Fuller v. Mayor City Jackson, 92 Mich. 197; Wilkinson v. Detroit Co., 73 Mich. 405.

## IN DIVISION ONE.

WOODSON, J.— This is a suit which was instituted by the plaintiff against defendant, in the circuit court of Jackson county, asking damages in the sum of twenty-five thousand dollars for personal injuries sustained by her through the alleged negligence of defendant in permitting a coal hole in one of its streets to become out of repair and remain in a dangerous condition for pedestrians to pass over, and that while passing over it she stumbled and fell upon her knee and side, and, as a result, received an injury to her right knee, which resulted in the amputation of her right leg above the knee.

As there are no complaints lodged against the pleadings, it will serve no good purpose in setting them out in this opinion.

The evidence tended to establish the following facts:

On February 26, 1898, plaintiff was walking south on the west side of Wyandotte street in defendant city, with a bundle of clothing she had made and was carrying to the owner. In front of No. 1012 Wyandotte street there was a coal hole in the sidewalk, constructed of a metallic cylinder and a round lid; the evidence for plaintiff tended to show the cylinder ex-

tended from two to four inches above the stone side-
walk, while that of the defendant tended to show it
extended above the surface of the walk not to exceed
one-half to three-quarters of an inch; and all the evi-
dence tended to show that it had been in the same con-
dition for years that it was in on the day of the in-
jury; that when she reached said coal hole she struck
her right foot against it, which caused her to trip and
fall and thereby caused her knee to strike the metal
cover and greatly bruise and injure it, and pushed the
knee cap to one side, toward the inner side of her limb;
that by-standers assisted her to a passing buggy, and
she was driven to her home, where she remained a few
days, where the limb was examined by a massagist,
who was not admitted to practice, and her knee was
found to be bruised and very much swollen, and the
knee cap dislocated, as before stated, all of which
caused her to suffer much pain; that within a few days
she was taken to the City Hospital, which we gather
from the record belonged to the city, though there is
no positive evidence of that fact in this record; there
she received proper care and medical treatment but
continued to grow worse for two months, when it be-
came necessary, in order to save her life, to amputate
her right limb above the knee. Plaintiff admitted that
she had four or five years before the injury complained
of and suffered from tuberculosis of her right knee
joint; that some five or six years prior to this injury
she, while skating, fell on the ice and injured this same
knee, at Winona, Missouri, her then home. Sometime
later she was treated for that injury at Bethany Hos-
pital, in Kansas City, Kansas, where it was discovered
she had tuberculosis in that knee joint; and, in 1894,
Dr. Gray operated on this same knee joint, in St. Mar-
garet's Hospital, Kansas City, Missouri, for tubercu-
losis of the knee joint, and discharged her as well from
that institution in October, 1894. He also testified that

he never knew of a case of tuberculosis of the knee where it was necessary to amputate the limb in order to save the patient's life. The evidence also tended to show that she was in the City Hospital for like treatment in May and April, 1896; and some time in 1897 she received a fall from a street car, and again injured this knee. She had been a cripple most of the time from the date of her fall on the ice, while skating, and walked with a cane most of the time and with a crutch occasionally, and at times used neither; and the evidence tended to show she had neither at the time she sustained the injury sued for. She suffered more or less pain all the time, ever since her knee was first injured at Winona.

The plaintiff's testimony tended to show that the fall on the sidewalk so injured and aggravated the tuberculosis of her knee joint that amputation was necessary, and that the amputation would never have been necessary had she not received the injury complained of; while the defendant's evidence tends to show that the tuberculosis condition alone made the amputation necessary.

The evidence showed that plaintiff at the time of the injury was earning six or seven dollars a week.

Dr. Brummel Jones, being called as a witness on the part of the plaintiff, testified as follows:

"Q. Have you been present, Doctor, in this court room during the entire evidence for the plaintiff in this case? A. I have.

"Q. Have you heard it all? A. With the exception probably of ten minutes yesterday afternoon I have. I was probably five or ten minutes away.

"Q. Did you hear all the testimony given in the case with the exception of those ten minutes? A. I did.

"Q. When was the period of ten minutes, Doctor? A. Well, I came into the court room about ten

minutes past one, and my understanding was that court convened at one, so that is a supposition.

"Q.  Ten minutes after one you got here?    A. Yes, sir; about that.

"Q.  I will read to you, Doctor, all the testimony taken in this case during the ten minutes you were absent. . . . .

"Defendant objects for the reason that it is immaterial.  Objection sustained by court.

"Q.  Then I will ask you this question, Doctor: Presume that the evidence which was given during the ten minutes did not refer to the injury to the plaintiff, nor to the extent of that injury, nor to her previous health, nor to her present health or anything connected with her condition, but referred entirely to the fall, the way the plaintiff fell, and the condition of the sidewalk upon which she fell; presume that to be true and presuming further, Doctor, that the testimony which you have heard given here, all the rest of that testimony, is true, what would you say, in your opinion as a medical expert, as to the reason why this plaintiff's leg was amputated?

"Defendant objects to the question for the reason that the case is not in a condition for expert testimony to be required or admitted.  It is an attempt to bring in this doctor, who knows nothing about the case except as he has heard it from the witnesses on the stand, and ask him why Dr. Coffin, after examination by other physicians, amputated the leg.  The evidence of that is Dr. Coffin and the other physicians who examined the knee.  Their evidence might be admissible because they know the facts and saw and examined the plaintiff, but this is a physician who knows nothing of the case except as he has heard the witnesses testify.

"Plaintiff objects to arguing the case at this time.

"By the Court:  They have a right to introduce

expert testimony and base it upon his knowledge and experience.

"Defendant objects to the hypothetical question for the reason that the proper foundation has not been laid and all of the facts connected with this woman's physical condition have not been stated in the hypothetical question, and some of the material facts have been left out of that question.

"Objection overruled by the court.

"Defendant further objects for the reason the question is not in proper form, but calls for his opinion from what he heard in the court room and it is possible he didn't hear distinctly.

"Objection overruled by the court.

"Defendant excepts to the ruling of the court.

"Q. By Mr. Latshaw: Doctor, taking it for granted that during the ten minutes you were not in the court room the testimony then produced in the case referred entirely to the sidewalk and its condition, and the manner of the plaintiff's fall, and that no testimony was given during your absence from the court room during that ten minutes in regard to her condition or in regard to the amputation, or in regard to her health either before or since the accident, or any evidence that affected her health or her limb or its previous condition, and assuming that the evidence you have heard here, which is all of the other evidence in the case on the plaintiff's part, is true, what, then, would you say as your opinion as a medical expert in regard to what was the cause of the amputation of the plaintiff's limb?

"Defendant objects to the question for the reason that it is assuming facts that the doctor cannot by any means know to be true, and an assumption of things that happened when he was out of the court room and he must be qualified.

"Objection overruled by court.

"Defendant excepts to the ruling of the court.

"By Mr. LATSHAW: We now offer to read to this witness the ten minutes' testimony that was given during the time he was absent from the court room yesterday afternoon, that testimony being at that time read to the jury from the bill of exceptions in the former trial and not recited by witness upon the stand.

"Defendant objects to the offer for the reason it is immaterial.

"Objection sustained by the court.

"A. You want me to state what, in my judgment, was the cause of her limb being removed?

"Q. Yes, sir. A. Or the cause of the necessity for its removal?

"Q. Yes, sir.

"Defendant objects. Objection sustained by court.

"By Mr. WILLIAMS: Q. Why was it removed, not the cause of its being so?

"By the Court: Go ahead.

"A. Well, I don't see my way clear to answer, but I will say, that I think, in my judgment, it was removed on account of the diseased condition that existed there.

"Q. Now, Doctor, in your opinion as a medical expert, under the evidence in this case that you have heard, what is your opinion as to what brought that disease to that particular limb and that particular part of it?

"Defendant objects for the reason it is incompetent, irrelevant and immaterial, not a proper question and not a proper subject for hypothetical questions, and the foundation has not been laid properly.

"Objection overruled by court.

"Defendant excepts to the ruling of the court.

"A. I would say that the injury precipitated the amputation, sir."

Defendant placed Dr. J. D. Griffith on the stand, and, after testifying at some length as an expert, he stated he was present and witnessed the amputation of plaintiff's leg, and after answering some eight or ten other questions, "defendant offered to prove by Dr. Griffith that he was present at the amputation and saw the leg amputated," to which offer plaintiff objected because he was present as a physician, and the court sustained the objection. Prior to this, the doctor testified that, "If I remember rightly, I saw her or she came to me at the Sister's Hospital, if I am not mistaken, or at my office, or somewhere, before she went to the City Hospital. I am not absolutely certain about it." He testified that he was not connected with the hospital, and that he was merely a visitor there at the time the amputation was performed.

Defendant also offered to prove by Doctors Stanley, Enne and Lane that the amputation was performed because of the tuberculosis in her knee. The plaintiff objected to the offer because Doctors Stanley and Lane were assistant surgeons in the hospital, and, as such, assisted in the amputation of the limb, and that Enne acquired his information while treating her for the injuries received when she fell from the street car in 1897, which objection was, by the court, sustained.

Defendant then offered to prove by Dr. Fulton: that witness is a physician and surgeon; that he saw plaintiff once, he thinks only once, which was, he thinks, in the fall or early winter of 1897, which would be about nine or ten months prior to plaintiff's fall on the sidewalk for which this suit was brought; when he saw plaintiff, she was lying on a cot in the City Hospital; Dr. Thrush was her physician in attendance at that time; that witness was holding clinics at the City Hospital and was looking for subjects to bring into the operating room; that this patient (plaintiff) was

not exhibited before the class, she not being just the
kind of material he wanted that day; he simply looked
at the patient, and looked at her right leg; that he did
not treat her, but merely advised treatment.

To this offer, plaintiff said: "We have no objec-
tion to the first part of that offer, but we do object to
the doctor testifying that he examined the patient's leg
and advised as to what treatment should be used."

Objection sustained by the court.

Respondent then further offers to prove by Dr.
Fulton "that he remembers the condition he saw
plaintiff in on that day and that he said to Dr. Thrush:
'Why don't you take it off?' (referring to plaintiff's
right leg); that upon the day he saw plaintiff in the
City Hospital he pulled up the cover, looked at her leg
and advised Dr. Thrush, her physician, to have it am-
putated at that time; that that was his sole connection
with the case; that he simply made that remark and
then went away."

Respondent further offered to prove by Dr. Ful-
ton that his "suggestion" to Dr. Thrush was "wholly
voluntary;" that he had no conversation with plaintiff,
and said nothing to her; that his examination was not
made for the purpose of prescribing treatment; that
he didn't make a diagnosis, merely suggested a diag-
nosis; that he did not prescribe for her, but merely
made a suggestion as to what he thought would have to
be done in that light; that whatever information he
received at that time he got from that examination,
which was a cursory examination; that he had no in-
formation aside from that examination; that the leg
was bare, and that he looked at the leg but did not
touch it; that he noticed there was a swelling and what
he considered a pretty bad condition of the limb; that
this condition was of the knee, and probably below the
knee; that he made a sufficient examination to enable

208 Sup.—12

him to form an opinion as between these conditions, that it was either malignant growth or tuberculosis; that his conclusion as to the condition of that limb was that it was either sarcoma or tuberculosis, and whichever it was, in his judgment, it would have to be amputated.

To all of which plaintiff objected, and was by the court sustained.

Dr. F. C. Frederick testified for defendant substantially as follows:

I am in charge of the records at the City Hospital; been employed there since 1892; kept the records for the last five years; have the official records with me kept in accordance with ordinances of the city; have examined them with reference to dates and circumstances pending confinement of Stella Smart at City Hospital; the first date of admission is May 26, 1895; she was in the hosiptal at that time until June 14, 1895; the diagnosis of that was tuberculosis.

Plaintiff objects to the diagnosis because it is not a part of the records of the hospital.

"Q. Is the diagnosis a part of the record? A. Yes, sir; it is on the record book, the same as the other part.

"By Mr. WILLIAMS: I now ask the witness the question as to the diagnosis.

"By the Court: I don't know who made it. A. The surgeon in charge.

"By the Court: Did he tell you about it? A. No, sir; it was put on the record.

"By the COURT: Who put it down? A. The house surgeon.

"By the COURT: You don't know whether it was correct or not? A. No, sir; whatever he put down was correct so far as I was concerned. It was there on the record.

"Plaintiff objects for the reason it is incompetent.

"Objection sustained by court.   No exception."

The next time she was in the hospital was April 8, 1896, and she was discharged May 18th, 1896; the next time she was in the hospital was August 24, 1896, being the third time.

"A.  She was in the hospital until the 10th of September, '96."

The next time she was in the hospital was March 15, 1898, her leg being amputated April 13th; she was discharged September 19th, 1898.

"Q.  Doctor, I will get you to state again how the diagnosis of the various cases is put on record? State whether or not it is done in every instance?  A.  It is a regular duty performed by the house surgeon. Whenever he sees a case and satisfies himself that . . .

"Plaintiff objects to the witness detailing the custom of the house surgeon.

"By the COURT:  What the doctor wrote on the book is not admissible for two reasons.

"By MR. WILLIAMS:  You mean it is a privileged communication, confidential information, and we can't prove it?

"By the COURT:  Yes, sir; if he gets it from the patient.

"Q.  Your understanding is that the diagnosis is first made by the physician in attendance, and that he copies that diagnosis and it is written down by the physician into that record?

"Plaintiff objects to his understanding of the matter.

"By the COURT:  He means what really occurs.

"A.   That is the process in each case."

The defendant duly excepted to all the rulings of the court in excluding the offers before mentioned.

At the close of plaintiff's evidence in chief, the de-

fendant asked a demurrer to the evidence, which the court refused to give and defendant duly excepted.

The court gave eleven instructions to the jury on behalf of plaintiff, only three of which are assailed in this court, and they are as follows:

"1.    The court instructs the jury that if you find and believe from the evidence that on February 26, 1898, and for a long time prior thereto, Wyandotte street was a public street within the defendant Kansas City, and that the sidewalk on the west side of said Wyandotte street and directly in front of No. 1012 Wyandotte street was at all said times a public sidewalk upon said street and that at all times a coal hole, with the covering and lid thereon, was in said sidewalk; then it became the duty of said defendant, Kansas City, to exercise ordinary care in keeping said sidewalk in front of No. 1012 Wyandotte street in a reasonably safe condition for persons lawfully walking thereon, and if you further find from the evidence that defendant, Kansas City, neglected said duty by allowing the covering and lid on said coal hole to be, on said February 26, 1898, and to remain for a long time prior thereto, in an unsafe and dangerous condition for travel on account of the covering and lid of said coal hole extending above the level of said sidewalk, and if you further find and believe from the evidence that defendant, Kansas City, either knew of said condition of said coal hole or by the exercise of ordinary care or caution could have known thereof in time to have had reasonable opportunity to have repaired said defect, if any, or had a reasonable opportunity to have caused the same, if any, to have been repaired in time to have prevented the accident to plaintiff hereinafter referred to, but failed and neglected so to do; and if you further find and believe from the evidence that on said 26th day of February, 1898, plaintiff, Stella Smart, was walking south on said

sidewalk in front of No. 1012 Wyandotte street she struck her right foot against or under the said covering of said coal hole and was thrown to the sidewalk and injured without any negligence on her part contributing thereto, then you are to find•for the plaintiff.

"2. If you find for plaintiff then in assessing her damages you may take into consideration all physical pain, if any, and mental anguish, if any, she suffered on account of the injuries, if any, she received by falling over the coal hole in front of 1012 Wyandotte street, on February 26, 1898, if you find and believe from the evidence that she did fall at said time and place. And if you further find and believe from the evidence that plaintiff on account of said injuries, if any, was compelled to lose her means of livelihood, you may take this into consideration and allow her such amount therefor, not to exceed seven dollars per week, as you may find and believe from the evidence she is entitled to. And if you also find and believe from the evidence that on account of said injuries it became necessary to amputate plaintiff's right leg and that the same was amputated on account thereof, then you may take that fact into consideration in assessing her damages and allow her such sum as you may find and believe from the evidence she is entitled to, not to exceed in all the sum of $25,000.

"3. The court instructs the jury that even though you should find and believe from the evidence that plaintiff had tuberculosis in her right knee or in her right leg, or in her system generally or had any other disease latent in her system, still, if you find and believe from the evidence that she was injured under the conditions and at the time and place set out in instruction number one (1) then the court instructs you that defendant is responsible to plaintiff for all effects which naturally and necessarily follow the injury, if

any, in the condition of health in which plaintiff was or plaintiff's said right leg or right knee was at the time, and it is no defense that the injuries, if any, may have been aggravated and rendered more difficult to cure by reason of plaintiff's state of health or that by reason of latent diseases the injuries, if any, were rendered more serious to her than they would have been to a person of robust health."

And at the request of the defendant, the court gave eight instructions and refused two, but no point is made of that refusal in this court.

The jury found for plaintiff and assessed her damages at the sum of $5,000, and judgment was rendered in her favor for that sum. Defendant in due time filed its motion for a new trial, which was by the court sustained; and to the action of the court in sustaining said motion the plaintiff duly excepted, and has brought the case to this court on an appeal from the order of the court sustaining said motion, which order is as follows:

"And now the motion for a new trial heretofore filed is taken up by the court for hearing and determination; and after fully hearing and duly considering the same, and being duly advised in the premises, the court orders that said motion be sustained on the grounds and for the reason that the court erred in refusing to allow the witness, Dr. Fulton, to testify, to which action of the court in sustaining said motion the plaintiff now here excepts."

I.   The sole ground assigned by the court for granting defendant a new trial in this cause is, that it erred in refusing to allow the witness, Dr. Fulton, to testify to the matters offered to be proved by him, which are set forth in the accompanying statement. Defendant contends that it has the right to call the attention of this court to any other errors committed

by the circuit court in the trial of the cause, and have them passed on also.

In passing upon the question indicated, this court held that the party obtaining the new trial has no occasion to appeal, but if the record discloses the grounds for a new trial, he is not precluded from showing by the record brought to this court by his adversary that he·was entitled to a new trial, notwithstanding the trial court specified only one, and that one perhaps not a sufficient reason for granting the new trial. [Emmons v. Quade, 176 Mo. l. c. 29; Bradley v. Reppell, 133 Mo. l. c. 560; Haven v. Railroad, 155 Mo. 216; Thompson v. Railroad, 140 Mo. 125.] Under this ruling we will consider any and all questions presented by this record which we deem necessary for the proper disposition of the case.

II.   And, as the court granted the new trial upon the supposed error in the refusal to permit Dr. Fulton to testify on behalf of defendant, we will first dispose of the question of confidential communications.

Defendant takes the broad position that the plaintiff by bringing this suit and asking damages for personal injuries thereby waived ·the    incompetency of her physician and surgeon to testify regarding information acquired from her while attending her in a professional capacity.   The statute regarding confidential communications between physician and patient in so far as applicable to this case is as follows: "The following persons shall be incompetent to testify. . . . Fifth, a physician or surgeon, concerning any information which he may have acquired . . . and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon." [R. S. 1899, sec. 4659.]

The meaning of this section is not veiled in doubt. It disqualifies the physician and surgeon from testifying to any information acquired by them while attend-

ing their patients in a professional capacity. The wisdom of such a law is addressed to the legislative branch of the government and not to the judiciary; the latter has to deal with its meaning and not the policy of the statute. That policy is not only well grounded in this State, but is firmly rooted in the jurisprudence of a majority of the states and territories of the Union; for this reason the courts should give .the statute full force and effect and not nullify it upon a mere pretext of an implied waiver of its provisions. Such a rule may and doubtless does work a hardship and an injustice in many cases, but that is greatly overshadowed and outweighed by the benefits it brings to the human family at large and to society in general.

If we correctly understand defendant's contention it is this, the bringing of an action, in which an essential part of the issue is the existence of a physical ailment, is a waiver of the privilege of all communications concerning that ailment. And Mr. Wigmore, in his work on Evidence, says: ''The whole reason for the privilege is the patient's supposed unwillingness that the ailment should be disclosed to the world at large; hence the bringing of a suit in which the very declaration, and much more the proof, discloses the ailment to the world at large, is of itself an indication that the supposed repugnancy to disclosure does not exist. If the privilege means anything at all in its origin, it means this as a sequel.'' [4 Wigmore on Evidence, sec. 2389.]

It seems to us that this is too narrow a view to take of the statute. If you could limit the inquiry to the particular injury sued for, there might be some apparent force in the contention for a waiver, but such injuries, when inflicted upon weak and diseased people, will more than likely aggravate the previous ailments, and rather than disclose such troubles, they might prefer to waive the aggravation and limit the re-

covery of damages to the apparent rather than to the
real extent of the injury; and, again, a person might be
suffering from some temporary loathsome disease at the
time of the injury, and the one might have no effect
upon the other or bear no relation whatever thereto.
In either of those cases, we are unable to see any good
reason for holding he or she may not place the seal of
secrecy upon the lips of the physician or surgeon,
who, through his confidential relation to the patient,
has learned of those ailments, which, if made known,
might and often do injuriously affect the business and
social standing of such persons in the community
where they reside. If it was not for this wise and be-
neficent statute, all the diseases to which the human
flesh is heir could, and in many cases would, be uncov-
ered, and held up to public view, with no corre-
sponding benefits to be derived therefrom, either as a
defense to the case, or in mitigation of damages. But
independent of what we have just stated, if the con-
tention of defendant is true, that the mere filing of the
petition in court in such cases waives the statutory
privilege, then said section 4659 has no force or effect,
and is an absolute nullity, because said section begins
by stating "the following persons shall be incompetent
to testify," etc. If this statute is waived by the mere
filing of the suit, then the patient cannot avail him-
self or herself of its provisions, and the disqualifica-
tion of the physician and surgeon is removed, and
they are thereby authorized to disclose all information
acquired by them in the examination and treatment of
their patients. If no suit is brought by the patient,
there could be no occasion for the physician or sur-
geon disclosing the confidential communications; but
the instant one is brought and trial had, and that being
the only possible occasion upon which the patient could
avail himself of the statutory privilege, he is met with
the proposition of implied waiver, and, as an inevita-

ble result, the statutory privilege could not be invoked in that case, nor in any other. In other words, as long as suit is not instituted, the physician is disqualified by the statute, and in that case there is no express or implied waiver, but under that condition he could not testify because there is no case pending in which to testify; but if suit is instituted, that fact waives the statutory privilege, and he becomes a competent witness and is authorized to disclose all confidential communications. Such reasoning leads to an absurdity, and totally emasculates the statute.

Defendant contends that this court is committed to the doctrine of waiver by the opinion in the case of Cramer v. Hurt, 154 Mo. 112. We do not so understand that case. That was a suit by the husband against a practicing physician to recover damages sustained by him for the loss of services, and the society of his wife, caused by an abortion committed upon her by the physician. In that case the physician was permitted to testify in his own behalf regarding information acquired by him while treating her upon the occasion complained of, and an objection was made as to his competency as a witness under section 8925, Revised Statutes 1889, which is the same as section 4659, Revised Statutes 1899, now under consideration. The defendant contended that the statute did not apply to a case like that, because, first, the rule of necessity, a well-known rule of evidence, was an exception to the statute and applicable to his case, and, second, that the wife waived the statutory privilege by voluntarily offering herself as a witness in behalf of her husband. After citing and discussing many authorities from this and other states supporting the doctrine of necessity, Judge BURGESS disposed of the defendant's first contention in the following language: "So in the case at bar, while holding that both defendant and Mrs. Cramer are competent witnesses in the case

with respect to the conversations between them in regard to his treatment of her in his professional capacity, and his manner of treatment, what he did, etc., is a departure from the prevailing rule of the law of evidence, we think it is fully justified by the authorities, *upon the ground of the necessity of the case.''* And in disposing of the second contention, Judge BURGESS said: ''Moreover, we think Mrs. Cramer is a competent witness in the case on general grounds of public policy, for if it be known that a married woman is a competent witness for her husband, in a suit for damages by him against a physician who produces an abortion upon her without the consent of her husband, in consequence of which her health is injured and he is deprived of her services to which he is entitled by law, and expenses are entailed upon him in her nursing and for medical treatment, it might to some extent at least put a stop to such revolting and unnatural practices. As the knowledge derived by defendant with respect to the condition of plaintiff's wife was privileged on her part and which she had the right to waive (Blair v. Railroad, 89 Mo. 383; Thompson v. Ish, 99 Mo. 160; Davenport v. Hannibal, 108 Mo. 471; Groll v. Tower, 85 Mo. 249), it is claimed that she did waive the protection of the statute by offering herself as a witness in behalf of her husband. But the abstract of the record nowhere shows that she offered herself as a witness, and shows nothing more than that 'Mrs. Cramer, being duly sworn on behalf of plaintiff, testified as follows' . . . Nor does it appear that the plaintiff is representing his wife in this case, or that he was at any time authorized by her to waive this privilege.'' [Cramer v. Hurt, 154 Mo. l. c. 120; Henry v. Sneed, 99 Mo. 407; Moeckel v. Heim, 134 Mo. 576; Ex parte Marmaduke, 91 Mo. l. c. 257.] The Cramer case in express terms held the wife to be a competent witness upon the grounds of public policy, and that the husband

could not waive the protection of secrecy offered her by section 4659, but that if she saw fit to do so, she could waive the statutory privilege and testify in his behalf, upon the grounds of public policy and necessities of the case.

The authorities cited firmly hold to the doctrine that a physician or surgeon is disqualified to testify in all cases regarding information acquired by him from a patient while attending him or her in a professional character, and which information was necessary in order to enable him to prescribe for such patient. [Smoot v. Kansas City, 194 Mo. 1. c. 527; Gartside v. Ins. Co., 76 Mo. 1. c. 451; Smart v. Kansas City, 91 Mo. App. 586; Streeter v. City of Breckenridge, 23 Mo. App. 244.]

III.   We will next consider the insistence of defendant, that the trial court committed error in excluding the testimony of Doctors Griffith, Stanley, Enne and Lane.

The only fact defendant offered to prove by Dr. Griffith which was excluded by the court, was that he was present at the time the amputation of the leg was performed. We are unable to see in what possible way defendant was prejudiced by that ruling of the court. The defendant did not go further and offer to prove or disprove by Dr. Griffith any fact in issue in the case; but confined the offer to prove the mere fact of his presence upon that occasion. There was no error in that ruling of the court.

We come now to the consideration of the competency of Doctors Stanley and Lane. They were assistant physicians and surgeons in the hospital where plaintiff was taken for treatment upon the occasion in controversy, and they assisted in the treatment and amputation of plaintiff's leg. Under and by virtue of their appointment, contract, or by whatever arrangement they became assistant physicians in that hospital

they were constituted the physician and surgeon of each and every patient who entered that institution for treatment, and they had no legal or moral right or authority to view, treat or operate upon any of them, except by virtue of that appointment or contract. Even their very presence there is traceable to and authorized by that authority and none other; and the intrusion of a physician or surgeon into an institution of the character in question, and his assumption of authority to observe and examine patients without the permission of those in charge, and by the consent of the patients, would constitute him a trespasser. Such is not tolerated by the law, and would not and should not be permitted by those in charge.

The relation of physician and patient is one of contract, either expressed or implied, and can be created in no other way. In cases of this character the physician or surgeon in accepting such a position impliedly, at least, agrees to treat such patients as are accepted into the institution, and when he assumes to examine them, either by their express agreement, or by their implied or tacit consent, which may be inferred from the act of entrance into the institution, and which will be inferred in the absence of evidence indicating a contrary intention in either event, whenever the minds of the physician and patient meet by either express or implied contract, the statute places the seal of secrecy upon all information acquired by the physician in such professional capacity.

The same rule of law applies as fully and effectually to the assistant physician as it does to physician and surgeon in chief. [Renihan v. Dennin, 103 N. Y. 573; Prader v. Accident Assn., 95 Iowa 156 and 157; Edington v. Mutual Life Ins. Co., 67 N. Y. 194.]

The rule has also been applied to the partner of the attending physician, even though the partner never prescribed for the patient. [Raymond v. Railroad,

65 Iowa 152; Aetna Life Ins. Co. v. Deming, 123 Ind. 384.]

It makes no difference in principle so far as the physician's disqualification is concerned whether he acquires the confidential communications from a poor or pay patient, in a private residence or hospital, or from a charity patient in a public hospital.

The same statute disqualifies an attorney from divulging the confidential communications between himself and his client, and it makes no difference whether the client is poor or rich, nor whether he lives in a palace or in a poor house—the same rule applies in both cases. The poor and needy are as much protected by the law as the rich and strong. Certainly the statute makes no such distinction or exception, and we do not feel justified to write such exceptions into the statute. [Elliott on Evidence, secs. 634 and 635; Grossman v. Supreme Lodge, 6 N. Y. Supp. 821.]

It necessarily follows from what has been stated that neither Stanley nor Lane was competent to testify to any information they acquired while acting in their professional capacity.

Clearly, Dr. Enne was not a competent witness to testify to information acquired by him during his treatment of plaintiff for the injuries she received by falling from the street car in 1897.

The court properly excluded his testimony from the jury. [Smoot v. Kansas City, 194 Mo. 1. c. 527; Glasgow v. Railroad, 191 Mo. 1. c. 358.]

The same principle of privileged secrecy applies to Dr. Fulton's evidence as was applied to the evidence of Doctors Stanley and Lane. When we look at the facts surrounding Dr. Fulton, they are not materially different from those regarding the two former physicians. The record discloses he had some kind of arrangement by which he had access to the hospital and the right to examine patients, select such as he wished

and take them into an operating room for use in the clinics, which he had authority to hold in the institution in which plaintiff was confined. It is true, the record shows Dr. Thrush was the physician in charge of the institution and was the chief attendant of the plaintiff upon that occasion, yet the very evidence defendant offered shows Dr. Fulton approached plaintiff while in bed, "pulled up the cover, looked at her and *advised* Dr. Thrush, her physician, to have it amputated at that time," because as the offer shows he thought she had "either sarcoma or tuberculosis, and whichever it was, in his judgment, it would have to be amputated." Under that state of facts defendant offered to prove by Dr. Fulton the examination of her leg made by him, that she was suffering from sarcoma or tuberculosis of the knee joint, and that he *advised* Dr. Thrush to amputate the leg. To this evidence the plaintiff objected because the facts stated constituted him her physician and that under section 4659, Revised Statutes 1899, he was disqualified from testifying to the facts contained in the offer made, which objection was by the court sustained, but, afterwards, the court granted the defendant a new trial because of the alleged error in excluding that evidence from the jury; and from the order sustaining the motion for a new trial the plaintiff appeals to this court, as before stated, claiming there was no error in the ruling of the court in excluding that evidence.

Defendant contends Dr. Fulton was not plaintiff's physician and was, therefore, a competent witness to testify as to the condition of her leg some ten months prior to the date of the injury in question, while the plaintiff upon the other hand contends he was her physician and had no right to disclose those confidential matters.

The defendant proceeds upon the theory, because Dr. Fulton did not treat plaintiff nor did not intend

to do so, he was not on that account her physician, and in support of that contention cites the following authorities, all of which hold that if the relation of physician and patient does not exist, the physician may testify, to-wit:    Schermer v. McMahon, 108 Mo. App. 36; Henry v. Railroad, 57 Hun 76; James v. State, 102 N. W. 320; Scripps v. Foster, 41 Mich. 742; Matter of Freeman, 46 Hun 458; Griffiths v. Railroad, 171 N. Y. 106; People v. Koerner, 154 N. Y. 355; People v. Sliney, 137 N. Y. 570; Fisher v. Fisher, 129 N. Y. 654; In re Will of Bruendl, 102 Wis. 45; Webb v. Railroad, 89 Mo. App. l. c. 611; Elliott v. Kansas City, 198 Mo. 593.

We cannot concur with the defendant in its contention that the relation of physician and patient never existed between plaintiff and Dr. Fulton simply because he never treated her, nor ever intended to do so.

This record shows Dr. Fulton was rightfully in the hospital, was exercising authority over the patients, examining their persons, advising treatment, and removing patients from their wards to the operating room for clinical purposes; and all this with the knowledge and consent of those in charge of the institution. If he was not rightfully there, then he was not only a trespasser in the institution but was guilty of the crime of assault and battery by approaching plaintiff's bed, where she was lying, and pulling up the covers and exposing her person and making the examination.    We will not presume he was guilty of a crime, because the law   presumes every one innocent until he is proven guilty beyond a reasonable doubt.    Besides all this there is no evidence in this record tending to show but what plaintiff thought and believed he was one of the attaches of the institution, and, as such, had the authority to do what he was doing there.

It is not necessary in order to create the relation of physician and patient that he should actually treat the patient.    If he makes an   examination of   the

patient, with her knowledge and consent, she believing that the examination is being made for the purpose of treating her, then the relation is created by implication, and it is wholly immaterial what the secret object or purpose of the physician was in making it; and in the absence of evidence to the contrary, the plaintiff had the perfect right to assume and rely upon the assumption that the physicians who were apparently in charge of the hospital were rightfully there, and, as such, had the authority to examine and prescribe for her, and he will not afterwards be heard to say he was not connected with the institution and had no authority to examine or treat her. If such a thing as that could be done, then the privilege accorded the patient could be taken from her by trick or fraud.

This question has received the careful consideration of many courts of this country. Judge ROMBAUER, one of the ablest jurists this State has ever produced, said: "It appeared from Dr. Frazer's testimony that he examined the patient to be enabled to prescribe for her, which rendered him prima-facie incompetent to testify to his knowledge derived from such examination, whether acquired from conversation or observation. There is nothing in the record to show that the relation of physician and patient did not exist between him and the plaintiff, that is to say, there is nothing to show that the patient in speaking to him was advised that he came to examine her in the interest of defendant, and not in her interest. . . . There is no offer to show that the witness was called to testify to other facts than such as he learned from the examination of the patient, and which were covered by the statutory privilege." [Weitz v. Railroad, 53 Mo. App. 39-44.]

Nor is there any evidence in this record to show that Dr. Fulton made the examination of plaintiff in

208 Sup—13

his search for subjects for his clinics, and not in her own interest; but upon the contrary he then and there, after the examination, advised Dr. Thrush to amputate her limb. Under such circumstances she would naturally suppose the examination was made in her own interest and not in the interest of another. If she had known all the facts she could have lawfully refused Dr. Fulton the privilege of making the examination.

In the case of Haworth v. Railroad, 94 Mo. App. 225, the offer was as follows: "I offer to show by this witness that he made a physical examination of the plaintiff, Walter Haworth, on the fourteenth day of May, 1901, just after receiving the injury for which this suit is brought, and he made such an examination, not as the physician of Walter Haworth but as the physician of the defendant company, and that Haworth at the time knew he was a physician, and I offer to show from that examination that nothing was discovered save and except a scalp wound." In passing upon that offer, Judge GOODE said: "The court rightfully refused to permit this physician, who attended the plaintiff professionally, to testify what he learned while treating him, since it was objected to as privileged. [R. S. 1899, sec. 4659; Gartside v. Ins. Co., 76 Mo. 446; Streeter v. City of Breckenridge, 23 Mo. App. 244; Corbett v. Railroad, 26 Mo. App. 621; Freel v. Railroad, 97 Cal. 40; Raymond v. Railroad, 65 Iowa 152.]"

In a case in New York, "Dr. Bontecon was requested by the attending physician to be present at the testator's house for consultation with him relative to the testator's condition and treatment, and, in pursuance of such request, he did attend. He was called as a witness for the contestants, and testified that he saw the testator, and advised a prescription for him." In passing upon this evidence, Judge EARL, speaking for the court, said: "It is true the testator did not call him, or procure his attendance; but he did not

thrust himself into his presence or intrude there. He was called by the attending physician, and went in his professional capacity to see the patient, and that was enough to bring the case within the statute. It is quite common for physicians to be summoned by the friends of the patient, or even by strangers about him; and the statute would be robbed of much of its virtue if a physician thus called were to be excluded from its provisions, because, as contended by the learned counsel for the appellant, he was not employed by the patient, nor a contract relation created between him and the patient. To bring the case within the statute it is sufficient that the person attended as a physician upon the patient, and obtained his information in that capacity." [Renihan v. Dennin, 103 N. Y. 578-9.]

This question came before the Supreme Court of Iowa upon this state of facts: "Dr. C. S. Chase, a surgeon in the employ of defendant, as such visited the deceased at the instance of the defendant on the day following the accident. He called to ascertain the extent of the injuries, how they were received, to diagnose the case, to consult with the attending physician, and to approve or disapprove the treatment, and, if necessary, to administer treatment. During the course of his interview with the deceased, he informed him why he had called, and reduced to writing statements made by the deceased as to how the accident occurred, which statement the deceased signed. This statement, and the doctor's evidence as to the other statements made to him by the deceased as to how the accident happened, were admitted in evidence over plaintiff's objections as being incompetent." The court, in passing upon the admissibility of that evidence, said: "This case is clearly within the rule in Raymond v. Railroad, 65 Iowa 152, and under the ruling in that case the objection should have been sustained." [Keist v. Railroad, 110 Iowa 35-6.]

In another New York case Dr. Noll was introduced as a witness, and defendant endeavored to prove by him what he found to be the condition of plaintiff's health at some previous time when he examined her in the German hospital. The trial court excluded from the jury his testimony, and in passing upon that ruling the General Term of the Supreme Court used this language: "The correctness of this ruling is assailed on the ground that Dr. Noll was neither the attending physician nor his assistant, and that no relation of doctor and patient existed between him and the deceased. The testimony of the doctor as to his functions at the time he saw Mrs. Grossman is somewhat contradictory. He said he and Dr. Wolf made the rounds of the hospital together, and generally examined the cases together, but that he was not the physician attending Mrs. Grossman, or prescribing for her. 'I went there just out of curiosity, to acquire information in interesting cases,' said the witness. 'I went with Dr. Wolf, who was the attending physician. We generally tried to confirm diagnosis. I went there to find out the condition of the patient, and the ailments.' At the very beginning of his examination as to his competency to testify, however, the witness had stated to the court . . . that when Dr. Wolf went to examine the patient he accompanied him, 'and assisted him in making the examination.' He also said that he was a physician in the hospital, and had charge of the different wards with Dr. Wolf. Upon the statements of the witness, to the effect that in association with Dr. Wolf he had charge of the different wards in the hospital; that he assisted Dr. Wolf in making the particular examination the result of which he was asked to disclose; and that he partly attended the patient, we think the court properly held that the witness was disqualified. 'To bring the case within the statute,' says Judge EARL in Renihan v. Dennin, 103 N. Y. 573-579, 9 N. E.

320, 'it is sufficient that the person attended as a physician upon the patient and obtained his information in that capacity.' '' [Grossman v. Supreme Lodge, 6 N. Y. Supp. 822-3; Prader v. Accident Assn., 95 Iowa 156-7; Edington v. Mutual Life Ins. Co., 67 N. Y. 194; Grattan v. Ins. Co., 24 Hun 43.]

Information acquired by the physician by looking at the patient or by examination is as much within the statute as are the verbal communications which take place between them. [Smoot v. Kansas City, 194 Mo. 513; Gartside v. Ins. Co., 76 Mo. 446; Kling v. Kansas City, 27 Mo. App. 231.]

The court has upon several occasions clearly drawn the line between competency and incompetency of such witnesses. [Hamilton v. Crowe, 175 Mo. 634; Holloway v. Kansas City, 184 Mo. 19; Smoot v. Kansas City, 194 Mo. 513.]

The defendant's next contention is that the court erred in excluding the evidence of Dr. Frederick. He was one of the attending physicians at the City Hospital, and was the keeper of and had charge of the records of the institution, which were required to be kept by the ordinances of the city. The defendant offered to prove by him the diagnosis of plaintiff's case, as shown by said official record, when she was in the hospital in the years 1895, 1896 and 1898, the latter when her leg was amputated. The plaintiff objected to the evidence offered because the entries made were privileged communications, first made to the attending physicians in order that they might correctly diagnose her case and to properly treat her. The diagnosis of the case was made by an examination of the patient and by interrogating her regarding the complaint. This is necessary to be known by the physician in order that he may prescribe the proper treatment, and when he once acquires that information the law declares it to be

confidential communications, and disqualifies the physician from divulging the same upon the witness stand.

Mr. Elliott in his work on Evidence, in the discussion of such statutes says: ''It seems to be conceded in both opinions that hospital physicians, who attend such persons at the hospital, could not testify as to what they learned while so attending him.'' [1 Elliott on Evidence, sec. 635; Grossman v. Supreme Lodge, 6 N. Y. Supp. 821.]

This is undoubtedly the rule as announced by all the authorities, and that being so, it seems that it must follow as a natural sequence that when the physician subsequently copies that privileged communication upon the record of the hospital, it still remains privileged. If that is not true, then the law which prevents the hospital physician from testifying to such matters could be violated both in letter and spirit and the statute nullified by the physician copying into the record all the information acquired by him from his patient, and then offer or permit the record to be offered in evidence containing the diagnosis, and thereby accomplish, by indirection, that which is expressly prohibited in a direct manner.

The only intimation of any law to the contrary we have been able to find is in a foot note to section 635 of Elliott on Evidence, vol. I, which reads as follows: ''On the other hand, if one voluntarily goes to a public hospital where a record is required to be kept, is there not some reason for saying that there is no privilege, or that he waives his privilege, at least so far as the law requires a public record to be kept?'' Mr. Elliott cites no authority whatever in support of the above suggestion, nor does he even dignify it by giving it a position in the text of his valuable work on evidence. But if that suggestion is sound law, what is the use of going through the empty form of writing the diagnosis into the record? Why not call the physi-

cian and let him testify direct as to those matters? Certainly the testimony of the physician would be more satisfactory than the record, because he would be under oath when giving his testimony and would be subject to cross-examination. In the case at bar Dr. Frederick testified that he did not know whether the entries made in the record were true or false; that the house surgeon writes the diagnosis in the record, and that he had no personal knowledge as to the truthfulness of the things written.

The mere fact that the ordinance of the city requires such a record to be kept is no reason on earth why the statute regarding privileged communications should be violated. That record is required to be kept' for the benefit of the institution and not for the benefit of outside litigants. It is not the object or purpose of the ordinance to repeal the statute in question, but even if it were it would be null and void, because in conflict with the statute. The object of the statute is to guarantee privileged communications between *all patients* and their physicians, and it is wholly immaterial whether they are in or out of hospitals. The only case where the patient is denied the protection of this statute is where his or her case falls under the rule of necessity, heretofore mentioned and so ably discussed by Judge BURGESS in the case of Cramer v. Hurt, 154 Mo. 112.

IV. This brings us to the consideration of the ruling of the court regarding the admissibility of the evidence of Dr. Jones, who was offered as a witness, and testified on behalf of plaintiff, over the objections and exceptions of the defendant. Dr. Jones was introduced to testify as an expert, and a full statement of what occurred while he was on the witness stand is set out in the statement accompanying this opinion. Dr. Jones had been present in the courtroom during the entire trial and heard all of plaintiff's testimony except-

ing the reading of a portion of the deposition of Miss Murray, which referred entirely to the condition of the sidewalk where plaintiff was injured and in no way referred to the plaintiff's health. Plaintiff then asked the following question:

"Q. Doctor, taking it for granted that during the ten minutes you were not in the courtroom the testimony then produced in the case referred entirely to the sidewalk and its condition, and the manner of the plaintiff's fall, and that no testimony was given during your absence from the courtroom during that ten minutes in regard to her condition or in regard to the amputation, or in regard to her health either before or since the accident, or any evidence that affected her health or her limb or its previous condition, and assuming that the evidence you have heard here, which is all of the other evidence in the case on the plaintiff's part, is true, what, then, would you say as your opinion as a medical expert in regard to what was the cause of the amputation of the plaintiff's limb?

"Defendant objects to the question for the reason that it is assuming facts that the doctor cannot by any means know to be true, and an assumption of things that happened when he was out of the courtroom and he must be qualified. Objection overruled by court. Defendant excepts to the ruling of the court.

"By Mr. LATSHAW: We now offer to read to this witness the ten minutes' testimony that was given during the time he was absent from the courtroom yesterday afternoon, that testimony being at that time read to the jury from the bill of exceptions in the former trial and not recited by witness upon the stand.

"Defendant objects to the offer for the reason it is immaterial. Objection sustained by court.

"A. You want me to state what, in my judgment, was the cause of her limb being removed?

"Q. Yes, sir.  A.  Or the cause of the necessity for its removal?

"Q. Yes, sir.

"Defendant objects.  Objection sustained by the court.

"By Mr. WILLIAMS:  Q.  Why was it removed, not the cause of its being so?

"By the COURT:  Go ahead.

"A.  Well, I don't see my way clear to answer, but I will say that I think, in my judgment, it was removed on account of the diseased condition that existed there.

"Q. Now, Doctor, in your opinion as a medical expert, under the evidence in this case that you have heard, what is your opinion as to what brought that disease to that particular limb and that particular part of it?

"Defendant objects for the reason it is incompetent, irrelevant and immaterial, not a proper question and not a proper subject for hypothetical questions, and the foundation has not been laid properly.

"Objection overruled by court.  Defendant excepts to the ruling of the court.

"A.  I would say that the injury precipitated the amputation, sir."

The defendant's first objection to the hypothetical question asked this witness is, that it was based upon only a part of the evidence, the part the doctor heard, and that there were other parts of the testimony he had not heard.  Ordinarily such an objection is well taken.  [Connell v. McNett, 109 Mich. 332; Sanchez v. People, 22 N. Y. 154.]

But in this case the plaintiff offered to read that part of the Murray deposition which he had not heard, and the defendant objected to the reading because it was immaterial, and the court sustained the objection. If the part of the evidence the witness did not hear

was immaterial to the question, then there was no error in the court's action in permitting the witness to answer the question without having it read to him. And in addition to this, even though the deposition had been material, the defendant is in no position now to take advantage of that error, because he led the court into committing the error by objecting to its being read, on the ground that it was immaterial. The defendant will not be allowed to state in one breath that it is material and in the next that it is not material. This court has repeatedly held that litigants will not be permitted to blow hot and cold in that manner.

The defendant's second objection to the hypothetical question propounded to Dr. Jones is of a more serious character. The grounds of that objection are, that the question and answers are conclusions of the witness, and permitted him to select one of the two causes which the evidence tended to show might have caused the necessity for the amputation, and thereby invaded the province of the jury. There was much evidence in this case which tended to show that the amputation was rendered necessary by reason of the tuberculosis of her knee joint. The jury should have been left untrammeled to find from the evidence which one of the two alleged causes actually rendered the amputation necessary. The hypothetical question should have been limited to the inquiry, as to whether or not the fall upon the street was a sufficient cause to produce the condition in plaintiff's knee as would necessitate the amputation of her leg two months after receiving the injury complained of, and then the jury should have been permitted to determine which of the two causes, the fall or the tuberculosis, was responsible for the amputation. When Dr. Jones was permitted to state that "the injury precipitated the amputation," he threw an improper weight into the

scales of justice upon the side of plaintiff, and to the serious detriment of defendant.   It is useless to discuss this question further, because I am unable to add anything of importance to the full, clear and able discussion of this same question by VALLIANT, J., in the opinion of the court written by him in the case of Glasgow v. Railroad, 191 Mo. 358-366.

We do not wish to be understood as holding that the plaintiff could not introduce proper evidence to prove her fall caused the necessity for the operation, or that the fall aggravated or hastened the amputation; but, in either case, the jury and not the expert must answer the question.

V.   Defendant presents several objections to instruction numbered 1, given for the plaintiff, but we are of the opinion that but two of them are of sufficient importance to require our consideration.

It is first contended that the instruction ignores the distance the coal hole extended above the surface of the sidewalk.   The evidence upon that question was conflicting—that for plaintiff showed it extended above the surface of the sidewalk from two to four inches, while that of the defendant showed it did not exceed three-quarters of one inch.

Where the evidence is conflicting upon any question in the case, then it is for the jury, under proper instructions, to determine which is correct.   Instruction numbered 1 relating to the point now in hand is as follows:  ". . . .  and if you further find from the evidence that defendant, Kansas City, neglected said duty by allowing the covering and lid on said coal hole to be, on said February 26th, 1898, and to remain for a long time prior thereto in an unsafe and dangerous condition for travel thereon on account of the covering and lid of said coal hole extending above the level of the sidewalk," etc.   The distance the coal hole projected above the surface of the walk was dis-

puted, and it was for that reason left to the jury to find whether that extension was or was not such an obstruction in the sidewalk as would render it unsafe and dangerous to pedestrians in passing over it in the ordinary modes of travel.    The instruction correctly stated the law regarding that question.

The defendant recognized the correctness of that instruction by asking the following: ''If the sidewalk when and where the plaintiff claims she fell was in a reasonably safe condition for travel in the ordinary modes by persons exercising ordinary care for their own safety, then the city has performed the obligation imposed by law, and is not liable,'' etc.    There is no difference in principle between the two instructions and even though they announced an erroneous statement of the law, the defendant is in no position to take advantage of that error, because the error, if error it be, was committed as much at the request of the defendant as at that of the plaintiff.    A party cannot complain of error in instructions which he adopted in his own.    [Christian v. Ins. Co., 143 Mo. 460; Soldanels v. Railroad, 23 Mo. App. 516; Nagel v. Railroad, 104 Mo. App. 444.]

And the second objection lodged against said instruction numbered 1 is, that it requires the city to have repaired the sidewalk in time to have prevented the accident to plaintiff, because it makes the defendant an insurer of safety of its streets and sidewalks. That part of the instruction complained of is in the following words: ''. . . . and if you further believe from the evidence that defendant, Kansas City, either knew of said condition of said coal hole, or by the exercise of ordinary care or caution could have known thereof in time to have had reasonable opportunity to have repaired said defect, if any, or had a reasonable opportunity to have caused the same, if any, to have been repaired in time to have prevented

the accident hereinafter referred to, but failed and neglected to do so, . . . . then you will find for the plaintiff.''

Counsel for defendant misconceives the meaning of the instruction. It nowhere tells the jury that it was the duty of the city to have repaired the sidewalk in time to have prevented the injury to plaintiff, but, upon the other hand, it told the jury that if the city knew, or by the exercise of ordinary care could have known of the defect, if any, in time to have had reasonable opportunity to have repaired said defect, if any, or had a reasonable opportunity to have caused the same, if any, to have been repaired in time to have prevented the accident. The words, ''in time to have prevented the accident,'' as used in the instruction, are for the purpose of fixing the time when it became the duty of the city to make the repairs, and are but another way of telling the jury that it was the duty of the city to have made the repairs prior to the date of the accident, provided it had knowledge of the defect in time to have done so. While the language is somewhat ambiguous, yet we are unable to see in what way it could have misled the jury. The instruction correctly declared the law. [Baker v. Independence, 106 Mo. App. 511-12; Bonine v. Richmond, 75 Mo. 439-440; Yocum v. Trenton, 20 Mo. App. 493; Baustian v. Young, 152 Mo. 325; Jordan v. Hannibal, 87 Mo. 675; Squires v. Chillicothe, 89 Mo. 231; Franke v. St. Louis, 110 Mo. 523; Maus v. Springfield, 101 Mo. 613; Barr v. Kansas City, 105 Mo. 555-6; Railroad v. Kavanaugh, 163 Mo. 54.]

VI. Defendant assails instruction numbered 2 given by the court in behalf of plaintiff because it permitted the jury to take into consideration the amputation of plaintiff's leg, in fixing the amount of her damages. If the evidence shows that the leg was amputated because of the fall, and the jury finds that to

be a fact, then it was proper for the jury to consider that question in estimating the damages. [Brown v. Railroad, 66 Mo. 588; Owens v. Railroad, 95 Mo. 169-182.]

But if the jury should find that the amputation was the result of the tuberculosis of the knee, then that fact should not be considered by the jury in measuring her damages. [Smith v. First Natl. Bank, 99 Mass. 605; Searles v. Railroad, 101 N. Y. 661.]

VII. The third instruction given for plaintiff is assailed by defendant because the petition alleges that the amputation of plaintiff's leg was caused by the fall received on the sidewalk, while the instruction permitted the jury to consider it as an aggravation of existing ailments, and cites Watson on Damages (Ed. 1901), sec. 206; Fuller v. Mayor of Jackson, 92 Mich. 197; Wilkinson v. Detroit S. & S. Works, 75 Mich. 405. Whatever may be the rule upon that subject in Michigan, clearly it is not the rule in this State. In this State both sick and well men and women have perfect rights to sue and recover damages for injuries received in the condition of health in which they are at the time of the injury. This is well established in the following cases: Brown v. Railroad, 66 Mo. 588; Owens v. Railroad, 95 Mo. 169; West v. Railroad, 187 Mo. 351; Delaplain v. Kansas City, 109 Mo. App. 107; Elliott v. Kansas City, 174 Mo. 554.

VIII. While we do not concur in the reasons assigned by the trial court for sustaining the motion for a new trial, yet we affirm the judgment because of the error of the court committed in the admission of the evidence of Dr. Jones.

*Valliant, J.,* concurs; *Graves, J.,* concurs in result, but dissents as to paragraphs two and three; *Lamm, J.,* concurs in result in separate opinion.

## IN BANC.

PER CURIAM.—The opinion written by Woodson, J., in Division No. 1, is adopted as the opinion of the Court in Banc. All concur, except *Graves, J.,* who concurs in result, but dissents as to paragraphs two and three; and *Lamm, J.,* who concurs in result in separate opinion in which *Graves, J.,* concurs.

## SEPARATE OPINION.

LAMM, J.—I agree to the conclusion reached by my Brother Woodson in affirming the judgment, but I dissent from his conclusion in regard to the testimony of Doctor Fulton. The advice Fulton gave to the house surgeon, Doctor Thrush, about amputating the leg should have been excluded; but what he saw at the time he inspected plaintiff's knee and any conclusion he drew from that inspection was competent testimony—the relation of physician and patient not existing between him and Miss Smart, either by tacit or express agreement. From a standpoint of professional ethics there could be no indelicacy in Doctor Fulton's examining a diseased knee under the circumstances in the record; and if there was a violation of mere punctilio, it in nowise affected the competency or cogency of the offered proof.

I am, furthermore, of the opinion that when Miss Smart tendered to the jury the issue as to the condition of her knee both before and after the injury (which she did) and when she withdrew the veil of professional secrecy by introducing as a witness one out of a number of physicians who had examined her knee, and by his testimony made public the result of his investigation as to its condition, she waived her privilege of privacy and confidence as to any of her other physicians in relation to the same subject-matter. A litigant should not be allowed to pick and choose in

binding and loosing—he may bind or he may loose. If he binds, well and good; but if he looses as to one of his physicians, the seal of secrecy is gone—the spell of its charm is broken as to all. May one cry secrecy! secrecy! professional confidence! when there is no secrecy and no professional confidence? As well cry, Peace, peace, when there is no peace. (Jeremiah 6:14 *q. v.*) To hold so leaves a travesty on justice at the whimsical beck and call of a litigant. He may choose a serviceable and mellow one out of a number of physicians. to fasten liability upon the defendant, and then, presto! change! exclude the testimony of those not so mellow and serviceable, to whom he has voluntarily given the same information and the same means of getting at a conclusion on the matter already uncovered by professional testimony to the jury. There is no reason in such condition of things, and where reason ends the law ends. The right to secrecy in confidential and professional matters may be likened unto salt. But what if the salt has lost its savour, wherewith may aught be salted? To my mind the time has come for us to take a step in advance and to construe the statute to mean that when a litigant breaks the seal of professional confidence and secrecy and waives it as to A., then by the same token it is broken and waived as to B., C. and D. who bore the same relation to him as did A.

*Graves, J.,* concurs in these views.