OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1913.

(Continued from Volume 249)

## SAMUEL EPSTEIN v. PENNSYLVANIA RAILROAD COMPANY, Appellant.

### In Banc, May 10, 1913.

1. **APPEAL: Jurisdiction: Transfer from Court of Appeals: Conflict in Decisions.** The Constitution says that "when any one of said courts of appeals shall in any cause or proceeding render a decision which any one of the judges therein sitting shall deem contrary to any previous decision of any one of said courts of appeals" the cause shall be transferred to the Supreme Court; and that means that it is wholly immaterial whether or not such conflict does in fact exist, if one of the judges of the Court of Appeals deems it to exist. Wherever one of the judges believes a conflict exists between a decision rendered in a case properly appealed to the Court of Appeals and a decision rendered by another Court of Appeals, it is the duty of the Court of Appeals to transfer the case to the Supreme Court, and after such transfer the Supreme Court has jurisdiction.

2. **WITNESS: Competency: Physician.** Under the statute (Sec. 6362, R. S. 1909), a physician cannot, over the patient's objection, testify as to any information he obtained while attending

the patient in a professional capacity. His disqualification is not dependent upon the existence, either express or implied, of a contractual relation for hire, but arises wherever, from the nature of the services intended or rendered, the relation of physician and servant existed. The rule applies to physicians who, after passengers were injured by train collisions and were taken to a city hospital, were present solely to aid in a great calamity for humane reasons and voluntarily proffered their professional services to the injured plaintiff.

3. ———: ———: ———: Waiver: By Patient's Testimony. The patient may waive the disqualification of his physician to testify; and this he may do by himself voluntarily giving in evidence the facts and nature of his ills and the communications had with and acts done by his physician while treating him. And where his physician was called by and testified for defendant, fully and in detail, to his conversations with and treatment of plaintiff, without objection, and where he himself voluntarily laid bare all the secrets of the sick-room, and told the precise nature of his alleged injuries as he said the said physician found them and the treatment given, plaintiff thereby waived the incompetency of other physicians also present in the sick-room at the time of such conversations and treatment and having knowledge of them. [Distinguishing and modifying Smart v. Kansas City, 208 Mo. 162.]

*Held*, by LAMM, C. J., concurring, with whom GRAVES and BROWN, JJ., concur, that if a litigant uses a physician as a witness he does not thereby, without more, waive his statutory privilege to prevent other physicians he has had at other times and on other occasions from breaking the seal of professional secrecy. Nor does the patient, who says or does nothing of substance to lift the statutory veil of secrecy imposed on sick-room disclosures to his physician, waive the privilege even as to such physician. But if waived by word, conduct or act for the time, place or occasion in hand, the waiver must be held to operate to an extent limited only by logic and wisdom. No general rule can be laid down to be applied in every case. The extent of the waiver; or whether there has been a waiver at all, must depend upon the facts of the concrete case.

*Held*, by WOODSON, J., dissenting, *first*, that by one statute plaintiff was given the absolute legal right to testify, and by another the same right to prevent the voluntary physicians from testifying, and the mere exercise of the former did not destroy the latter; *second*, that plaintiff, by not objecting to one physician, called by defendant, testifying, did not waive his right to object to two other physicians, also called by defendant; and, *third*, if he lifts the veil as to all by using his own physician as a witness, or by not

objecting to his testifying when called by defendant, or by detailing the extent of his injuries as learned from his own physician or the one to whom he does not object, the defendant, who has caused his injuries, is thereby given the right to impose upon plaintiff a horde of physicians and nurses of its own choosing, in a hospital of its own choosing, who are present and assisting at the hospital to which he has been taken by defendant, when he is examined by his own physician or one to whom he does not object, and to use those physicians and nurses as witnesses, or else he must not himself testify as to the extent of his injuries and thus leave the case without any testimony on the question of the amount of damages.

TRANSFERRED FROM ST. LOUIS COURT OF APPEALS.

JUDGMENT OF CIRCUIT COURT REVERSED AND CAUSE REMANDED.

*Everett W. Pattison* for appellant.

The court erred in excluding the testimony of the two physicians who assisted Dr. Elston in examining plaintiff and dressing his injuries at Corry Hospital. The plaintiff testified as to what took place at the hospital, going fully into the details. Dr. Phelps and Dr. Christie were present assisting Dr. Elston. The court permitted Dr. Elston to testify, but rejected the testimony of the assisting physicians. When plaintiff removed the seal of secrecy as to the events which occurred at the hospital, he waived his privilege, not only as to Dr. Elston, but also as to the other physicians who were present assisting him. Webb v. Railroad, 89 Mo. App. 610; Highbill v. Railroad, 93 Mo. App. 223; Morris v. Railroad, 148 N. Y. 88, 51 Am. St. 675; Treanor v. Railroad, 16 N. Y. Supp. 538; Marx v. Railroad, 10 N. Y. Supp. 159; People v. Schuyler, 106 N. Y. 306; Lane v. Boicourt, 128 Ind. 420, 25 Am. St. 442. There is a marked distinction between the case at bar and that of Mellor v. Railroad, 105 Mo. 455, in this respect: In the Mellor case the two physi-

cians treated the patient at different times; in the case at bar, all at the same time. This distinction is recognized in several of the decisions cited just above.

*Jesse A. Wolfort* and *S. P. Bond* for respondent.

(1) The respondent moves the court to remand this case to the St. Louis Court of Appeals, as the Supreme Court is without jurisdiction to hear and determine said cause. Sec. 6, art. 6, Amendment Constitution of 1884; R. S. 1909, p. 101; Bank v. Wolsten, 144 Mo. 409; Railroad v. Smith, 154 Mo. 319. Because the St. Louis Court of Appeals affirmed said case of Epstein v. Railroad, 143 Mo. App. 135, in conformity with the decisions of the Supreme Court in the cases of Mellor v. Railroad, 105 Mo. 455, and Holloway v. Kansas City, 184 Mo. 19. And for the further reason that said two last-mentioned decisions are not in conflict with the Kansas City Court of Appeals, as announced in the cases of Webb v. Railroad, 89 Mo. App. 604, and Highfill v. Railroad, 93 Mo. App. 219, as interpreted by the same Kansas City Court of Appeals in the case of Hartley v. Calbreath, 127 Mo. App. 558, in which case Mellor v. Railroad, supra, is cited with approval and authority. (2) Respondent objects to the court considering the evidence of Drs. Phelps and Christie, complained of and included in appellant's abstract of record, because it was never submitted to the court, nor did appellant state to the court what it expected to prove by their depositions; and, furthermore, the testimony sought to be introduced was privileged. The court below did not err in excluding the depositions of Drs. Phelps and Christie. In fact, no part of Dr. Christie's deposition was offered by the appellant, as the additional transcript of the record shows, and the part offered of Dr. Phelps' was properly excluded. The court did not err, for the reasons: First. Because counsel for the appellant did not state to the court at the time what he intended to prove by

the witnesses, or either of them. Smart v. Kansas City, 208 Mo. 162; Ruschenberg v. Railroad, 161 Mo. 70. Second. Because anything that the witnesses Drs. Phelps and Christie learned concerning the respondent was by virtue of being his physicians, and hence privileged as was the testimony of Dr. Elston. Smart v. Kansas City, 208 Mo. 162, 176; Gartside v. Ins. Co., 76 Mo. 446; Groll v. Tower, 85 Mo. 253; Carrington v. St. Louis, 89 Mo. 216; Thompson v. Ish, 99 Mo. 160; Morton v. Moberly, 18 Mo. App. 459; Streeter v. Breckinridge, 23 Mo. App. 244; Corbett v. Railroad, 26 Mo. App. 626; Obermeyer v. Chair Co., 229 Mo. 97; King v. City, 27 Mo. App. 231; Weitz v. Railroad, 33 Mo. App. 39; Evans v. Trenton, 112 Mo. 390; Mellor v. Railroad, 105 Mo. 455; Haworth v. Railroad, 94 Mo. App. 225; State v. Kennedy, 177 Mo. 127; James v. Kansas City, 82 Mo. App. 20; Glasgow v. Railroad, 191 Mo. 347. Third. Because if it were for the purpose of impeaching appellant's witnesses, Edward Walters, John M. Andrews and R. J. Malone, as to their testimony concerning respondent being sick and complaining of injury to his stomach or for the purpose of impeaching the testimony of Miss Ida Falconer concerning the sprain to respondent's ankle, it is estopped for the reason that it could not impeach its own witnesses. Clafflin v. Dodson, 111 Mo. 201; Brown v. Wood, 19 Mo. 475. Fourth. At best, the testimony as set out in the depositions of Drs. Phelps and Christie would only be cumulative testimony added to the testimony of James Summerson, Mrs. Minnie Fowle, John M. Andrews, Miss Ida Falconer, Miss Lillian Stover, Drs. Page, Shortt, Elston and Baker, concerning the extent of respondent's injuries to his leg and not otherwise. The court erred in allowing the testimony of Drs. Page, Shortt, Baker and Dr. Elston, but as appellant got the benefit of their testimony, it cannot be heard to complain. (3) When the verdict is for the right person the appellate court will not re-

verse judgment unless error was committed materially affecting merits of action. Peterson v. Transit Co., 199 Mo. 331. (4) It is proper to make objections at the trial, to the competency, relevancy, etc., of any question or answer of a witness whose testimony is taken in the way of a deposition. Sec. 2906, R. S. 1899. (5) Where a judgment is manifestly right the court will not reverse, even if error were committed by the trial court. Mall v. Goodnight, 138 Mo. 577; Burns v. Liberty, 131 Mo. 378; Fitzgerald v. Barker, 96 Mo. 661; MacLeod v. Skiles, 81 Mo. 595; State ex rel. v. Edwards, 78 Mo. 477; Cartwright v. Culver, 74 Mo. 179; State ex rel. v. Boeppler, 63 Mo. App. 156. (6) Where upon the whole record it is manifest that the judgment is for the right party and the right amount it will not be reversed, though error was committed at the trial. State v. Bancroft, 1 Mo. 163; Crocker v. Mann, 3 Mo. 472; Jackson v. McGruder, 51 Mo. 55; Railroad v. Armstrong, 92 Mo. 265; Williams v. Mitchell, 112 Mo. 314; State ex rel. v. Jones, 131 Mo. 194; Fell v. Mining Co., 23 Mo. App. 225; Barrett v. Glover, 31 Mo. App. 157; Creek v. Waldron, 39 Mo. App. 26; Garasche v. Dean, 40 Mo. 168. (7) Where an erroneous ruling on evidence does not materially affect the merits of the action, the judgment will not be reversed. Hogan v. Railroad, 150 Mo. 50; O'Neil v. Kansas City, 178 Mo. 102; Sanders v. Bldg. & Loan Ass'n, 178 Mo. 681; Swope v. Ward, 185 Mo. 329; Bank v. Wells, 98 Mo. App. 573; Walker v. Cooper, 97 Mo. App. 448.

## IN DIVISION TWO.

FARIS, J.—This is an action for personal injuries alleged by the plaintiff to have been incurred by him in a wreck on defendant's railroad on the night of January 6, 1906. The case was tried in the circuit court of the city of St. Louis, and resulted in a verdict by nine of the jurors in favor of plaintiff, as-

sessing his damages at the sum of four thousand dollars. From this verdict and the judgment which followed, defendant, after the usual motions for a new trial, and in arrest of judgment, appealed to the St. Louis Court of Appeals. The case was heard in the St. Louis Court of Appeals at the October term, 1909, and judgment rendered, and an opinion filed in said court on the 2nd day of November, 1909, affirming the judgment of the court, *nisi*, in all things. [See 143 Mo. App. 135.] But as Judge REYNOLDS, Presiding Judge of said St. Louis Court of Appeals, deemed the conclusions reached in the case on the controlling points involved herein, to be in conflict with the decisions of the Kansas City Court of Appeals in the case of Webb v. Metropolitan Street Railway Co., 89 Mo. App. 604, and the case of Highfill v. Railroad, 93 Mo. App. 219, the case was transferred to this court pursuant to section six of the Amendment of 1884 to our Constitution. Touching the matter of our jurisdiction to entertain it, and whether the case is rightfully here, is strenuously questioned by the respondent. This point will be fully considered in the opinion herein, and we need not do more here than to give it bare mention, and thus preserve it for further reference.

The only question raised at the trial was as to the extent of the injuries resulting to plaintiff, and the amount of compensation he was entitled to therefor. The injuries which plaintiff claims to have suffered, and a part of the resultant damages accruing, are thus set forth in his petition:

"That his person was caught and became pinioned in said wreckage for a long time; that thereby his ankle was sprained, his leg, knee and person, stomach and liver were, and have been, wounded, crushed, bruised, cut, contused, both externally and internally, thereby greatly and permanently injuring him; that he was, and has been, confined to his bed and

house by reason thereof for a long time; that by reason of said injuries he was, and has been, disabled and prevented from going to New York City, New York, for the purpose of buying supplies and goods to carry on the wholesale dry goods, merchandise and notions business in which he was engaged, to his great loss and damages; that he was, has been, and will be unable to give his ordinary and usual time, care and diligence to his business; that he was, has been and will be prevented from work, labor and service, thereby greatly impairing his earning capacity; that he did, has been, and will be compelled to procure medical attention, medicines, nursing, nurse hire and expenses to Lena Epstein for eighteen days, $100 and round trip fare, $40, for nurse from Corry, Pennsylvania, to St. Louis, Missouri; and costs for physician's attentions to Dr. M. Golland from January 17th to June 7th, 1906, 124 calls, $3 each, $372; 11 night calls, $10 each, $100; 16 visits at office, $2 each, $32; surgical dressings, $23; and hospital expenses at Corry, Pennsylvania, $100; which were, now are, and will continue to be necessary for an indefinite period; that by reason of such great injuries and the horror of said wreck, his nervous system was caused to collapse, and his sexual powers to become impotent, and he has been, and will in the future be, by reason of said injuries and nervous shock, permanently injured; has suffered, and will in the future suffer, great mental pain and bodily anguish.''

The wreck in question occurred about ten miles from the town of Corry, Pennsylvania, and was one of the sort which usually occurs when a railroad company attempts to run two trains, going in opposite directions, at the same time, on the same track. A collision occurred, and the car in which plaintiff was riding was demolished. Plaintiff was thrown against the corner of the seat in front of him, and thence to the floor; the sides of the coach were buckled or bent

in, and the flooring of the car was also buckled and bent upward; the seats and cushions were torn loose; two other passengers were hurled down and on top of plaintiff and plaintiff's legs were caught and pinioned between the floor of the car, as buckled or bent upward, and the bottom, wooden portions of the seat. He was, as he states, "terribly frightened," and laboring under the fear that the "coach would catch on fire and that he would be burned up." It was necessary, in order to release plaintiff, to use axes and crowbars in cutting and prying the debris off of and from about plaintiff. The immediate cause of the injuries occurring to plaintiff, as we gather them from his testimony, was the pinioning of his left leg under the seat as stated, and the falling of another passenger upon his body, particularly upon his stomach.

The nature of the injuries received, as plaintiff details them, consisted in a tearing away of the flesh from the ankle and bone of his left leg, and in some sort of an internal injury to his stomach; which injuries, he says, in addition to crippling him, and rendering him lame, and confining him to his house, and keeping him away from his business for some four months, have resulted in the permanent impairment of his nervous system and in rendering him sexually impotent. It will suffice to say, however, upon this point, that there was a sharp conflict in the testimony as to the extent of plaintiff's injuries. In fact, as stated in the beginning, this was the only point in issue. If plaintiff is to be believed, the judgment in his favor for four thousand dollars was none too much; if defendant's contentions are true, then plaintiff is entitled to little more than nominal damages.

Upon the trial, touching the contention of plaintiff that he had been by his injuries and by the shock to his nervous system, and the fright engendered thereby, rendered sexually impotent, the following questions were asked and answered:

"Q. Before you were injured were you able to have intercourse with your wife?

"Mr. Patterson: I object to going into that question for two reasons. In the first place, it either requires expert testimony to support that charge of the petition, or else there must be testimony of non-access. I say, under the uniform, unbroken current of decisions, this witness cannot testify as to non-access, and this witness has not qualified as an expert. I object to the question as incompetent.

"The objection was overruled, to which ruling of the court defendant, by counsel, then and there duly excepted.

"A. Yes, sir.

"Mr. Bond: Since your injury have you been able at any time to have intercourse with your wife?

"Mr. Patterson: I object to the question on the same grounds.

"The objection is overruled, to which ruling of the court defendant, by counsel, then and there duly excepted.

"A. No, sir."

This was all of the testimony having any direct bearing upon the alleged sexual impotency of the plaintiff.

Plaintiff, as stated, testified upon the trial in his own behalf, and detailed fully the treatment given him and the consultations had by him with his physicians. After his release from the wreck he was taken in charge by defendant's agent and officers and transferred to the city hospital at Corry, Pennsylvania. There he was placed under the care of Dr. Elston, who was one of the directors of the hospital, and a member of the medical staff thereof. He was given surgical and medical treatment at this hospital by Dr. Elston, and conversations between plaintiff and Elston touching plaintiff's condition were had while the treatment and examination of plaintiff's injuries proceeded. At

these consultations, and assisting Dr. Elston in his examination of plaintiff and in the treatment of plaintiff, there were also present a Dr. Phelps and a Dr. Christie, neither of whom was conneted with the hospital, but both of whom seem to have been physicians and surgeons of the town of Corry, Pennsylvania, drawn to the hospital for the occasion, to assist for humane purposes in attending those injured in the wreck.

As to what occurred between the plaintiff and Elston and as to the manner in which plaintiff was treated surgically and medically; as to the consultations had between plaintiff and Dr. Elston, and as to the nature of the examination made and the injuries found, the below excerpts from plaintiff's testimony are pertinent:

"I was lying there crying and grunting, and in about half an hour there came another doctor, supposed to be a doctor, and he took off that bandage from that first doctor, and he took and put my leg in a pasteboard, heavy pasteboard up above the knee, and bandaged it around. I told that doctor that my stomach injured me. During the time when I was telling him that a man came to him and told him that a certain woman was injured, and he was called away. Then there were two doctors came after that, and I heard them say they were from Warren, Pennsylvania. I asked them to take me down there, because that would be nearer to my cousin's house, being as my cousin was living in Sheffield, and that is near Warren. They told me that any one that is not injured seriously will go to Warren, if they can walk over the debris. That is what the doctors said; and any one badly injured has to go to Corry or to Erie. So they took me to Corry. When they took me to Corry, they took me on a stretcher in an ambulance, and took me to the city hospital. There they took off my clothes, and the doctor examined my leg and I told him then

about my stomach, and he says: 'That will be attended to.' He took off the pasteboard from that leg and placed it in a different pasteboard, some kind of a red pasteboard that looked like leather, and put some stuff on my leg and bandaged it around. That was done the first night. That night I didn't sleep a wink. The nurse placed some hot water bags on my stomach and gave me some medicine for my stomach during the night. That night she came around about every fifteen or twenty minutes. I was restless the whole night. The next morning from laying there I had my back rubbed with some kind of medicine and they brought my breakfast. I couldn't eat anything; I didn't eat any breakfast at all. I asked if she had any milk, to give me some coffee, and she got me some hot milk to drink. About ten o'clock this doctor came, Dr. Elston, and he had the nurse holding my leg up and he took off the bandages and put some other salve on it, and bandaged it over the leg. He told the nurse to give me some tablets for my stomach, which she did. This was repeated every three hours, and other medicine was repeated every hour.

"My condition there was, my leg was hurting me, my stomach was hurting me, my mind was hurting me, pained me terribly. I thought I am going to have my leg taken off, and I asked the doctor at that time, and he says, 'I don't think that will have to be amputated. It will take a long time before it will heal up. It is worse than a break. Mashing the flesh away from the bone is worse than a break.' Dr. Elston said that. He saw the injury to my knee. He had to bandage it up, you know, the whole time.

"I left the hospital at Corry because I was not treated right there. The nurse did not tend to me right at night. I rang for the nurse for three hours, and I couldn't get her up. She was downstairs. There is only one nurse at night for three floors. And this

Dr. Elston didn't come for two days; he was not there
to tend to my leg and my stomach, and I saw I was not
treated right, so I thought the best thing for me was
to come home and have my own physician to tend me
right. That was a public hospital, city hospital, in
Corry, Pennsylvania. I paid there ten dollars a day. I
was sick all the time, the whole time I was on the car
coming home, but I used medicine Dr. Elston gave me
and another bottle of medicine. I went down to the car
on crutches, and my cousin, Ike Epstein, was leading
me on one side. When I got to the car two brakemen
took me up, and my counsin standing behind me, and
they lifted me up and took me up by the arms in the
car. I had a through car to Cincinnati. I had a cush-
ion under my leg lifting it up, because I couldn't hold
it down, all the way to Cincinnati. When I came to
Cincinnati, they took me down on the platform and I
could not walk; I could not have my leg down. A man
carried me from the train to the ambulance, carried
me on his shoulder, and Mrs. Lena Epstein carried the
crutches for me. In the ambulance I had the crutches
laid along here so that my leg should not move. I
had my leg in that position all the time. When I got
down there the driver took me off and I was placed
in a day-coach for St. Louis.''

In the cross-examination of plaintiff, touching
these same matters and occurrences, he testified as
follows:

''I got to the Corry hospital about one o'clock in
the morning. They dressed me and Dr. Elston ex-
amined my leg, and then I told him that my stomach
was hurt, and he gave some instructions to the nurse
what to do. I couldn't hear what the instructions
were. Dr. Elston gave them. I told him I got hurt in
my stomach. He didn't examine my stomach. I was
stripped in bed, but they only looked at my leg.

''There were other doctors there besides Dr.
Elston. At that time I didn't know their names; but

I learned next day that one of them was Dr. Phelps. I don't know the name of the other one. He was standing right there by Dr. Elston. There was a nurse there. I couldn't tell you what nurse it was. Miss Falconer was there. I believe they were all standing around my cot and looking at me.

"I was in the hospital ten days; not all the time in bed. I was continually in bed about three days. I had to lay until the doctor came and dressed my leg and give me some medicine. After the third day I got around in a wheeled chair and walked on crutches when I had to go out; when I went to the closet. I didn't get out of that bed until the third day; of that I am positive. Dr. Elston bandaged my leg in the bed for three days.

"I didn't consider I got good treatment there at the hospital. I would call for the nurse at nights. It pained me considerably, my stomach, and I had to have my leg moved. I couldn't hold it; I had to have pillows under my leg, and the pillows would move down, and it wasn't high enough, and I had to have some more pillows, and I rang for the nurse about three hours, and couldn't get her up, for one reason."

Upon the trial Dr. Elston testified for defendant fully, as to the consultations, examinations and treatment, and all matters in detail, had by the witness, Elston, with plaintiff at the hospital. To the offering of this testimony plaintiff made no objection, but permitted Dr. Elston to testify, without raising any question of statutory privilege, as to the competency of said Elston. Defendant upon the trial offered the depositions of Dr. Phelps and Dr. Christie, both of whom, as stated, were present while plaintiff was being examined and treated, and consulted with touching his injuries, by Dr. Elston. Present, also, at this examination and treatment, at least during a part of the time, thereof, was the nurse, a Miss Falconer, who also testified in the case for defendant, without objection

on the part of the plaintiff. When the depositions of
Drs. Phelps and Christie were offered by defendant,
the plaintiff objected, upon the ground that their testi-
mony was incompetent, because they were the physi-
cians of plaintiff, and that their communications with
plaintiff and their treatment of him, and the communi-
cations with plaintiff by Dr. Elston, and the details
of the nature of his injuries and of their examination
and treatment of plaintiff by said Elston, in the pres-
ence of these witnesses, were privileged. The court
sustained this objection and defendant duly saved its
exceptions.

The full text of the depositions of both Dr. Phelps
and Dr. Christie is preserved in the record in this
case, and the rejection of these depositions, under the
facts here form the chief contention of appellant.
Other facts, if they shall become necessary, will be
set out in the opinion.

## OPINION.

Upon the whole case three points are mooted, one
by the respondent, plaintiff below, and the other two
by the appellant. The point urged by the respondent,
hereinafter, for convenience, called the plaintiff, is
that this court is without jurisdiction to hear and de-
termine this case for the reason that upon the law and
the facts here, the instant case is not in conflict with
either the case of Highfill v. Railroad, supra, or Webb
v. Railroad, supra; *ergo,* that no legal reason arises
for the transfer of this case to this court and that
respondent is entitled to have it remanded to the Court
of Appeals. The points urged by the appellant are (a)
that the court, *nisi,* erred in refusing to permit defend-
ant to offer the depositions of Phelps and Christie,
physicians and surgeons, present and assisting, as
such, Dr. Elston in the latter's examination of plain-
tiff at the hospital at Corry, Pennsylvania, and (b)

that the court erred, the evidence in the case consider-
ed, in giving and in refusing instructions upon the
trial, on the question of the alleged loss by plaintiff
of his sexual powers. The latter point, it may be here
said, has in the concrete case many satellitious corol-
laries, all of which are cognate, and all of which, if we
shall in the end reach them, may well be considered
together.

We must needs first take heed of the point made
by plaintiff, for obviously should this point of juris-
diction be found well taken, then a discussion of the
questions raised by defendant will be unnecessary.

I.     The case is here because Judge REYNOLDS,
Presiding Judge of the St. Louis Court of Appeals,
who wrote the opinion in the latter court,
**Jurisdiction:** used this language: ''Finding no re-
**Conflicting**
**Decisions.** versible error we think the judgment
should be affirmed, but as our decision,
on the point indicated, is in conflict with that of the
Honorable the Kansas City Court of Appeals in the
two cases cited, we certify the case to the Supreme
Court,'' and because the St. Louis Court of Appeals
in its judgment said among other things: ''But as it
is deemed that this decision is in conflict with the two
decisions of the Kansas City Court of Appeals in the
cases of Webb v. Met. Street Ry. Co., 89 Mo. App. 604,
and Highfill v. Mo. Pac. Ry. Co., 93 Mo. App. 219, the
court further considers and adjudges that this cause
be certified to the Supreme Court of Missouri for de-
termination.''

Section 6 of the Amendment of 1884 to our Con-
stitution, provides thus:

''When any one of said courts of appeals shall in
any cause or proceeding render a decision which any
one of the judges therein sitting shall deem contrary
to any previous decision of any one of said Courts of
Appeals, or of the Supreme Court, the said Court of

Appeals must, of its own motion, pending the same term and not afterward, certify and transfer said cause or proceeding and the original transcript therein to the Supreme Court, and thereupon the Supreme Court must rehear and determine said cause or proceeding, as in case of jurisdiction obtained by ordinary appellate process; and the last previous rulings of the Supreme Court on any question of law or equity shall, in all cases, be controlling authority in said Courts of Appeals.''

Learned counsel for plaintiff urge that, as a matter of fact, there is no real conflict of opinion between the views expressed by the Court of Appeals in the instant case, and those held in the Webb and Highfill cases, supra, and that for this reason, we ought not to entertain jurisdiction. Because, say learned counsel, the case at bar was affirmed ''in conformity with the decisions of the Supreme Court in the cases of Mellor v. Railroad, 105 Mo. 455, 460, 461; and Holloway v. Kansas City, 184 Mo. 19, 44. And for the further reason that said two last-mentioned decisions are not in conflict with the Kansas City Court of Appeals, as announced in the cases of Webb v. Metropolitan Street Railway Co., 89 Mo. App. 604; and Highfill v. Railroad, 93 Mo. App. 219, as interpreted by the same Kansas City Court of Appeals in the case of Hartley v. Calbreath, 127 Mo. App. 558, 564, in which case Mellor v. Railroad, supra, is cited with approval and authority.''

In the view which we take of the duty devolving upon us by reason of the plain provisions of the constitutional amendment quoted, we do not think it makes any difference whether there is under all the facts a real conflict of opinion or not. This is a question delegated by the constitutional amendment quoted to any one of the judges of any of the several courts of appeals, subject, it is true, to the limitation that it is

the duty of the several courts of appeals to follow the rulings of the last authoritative utterance of this court on the point involved. [Schafer v. Railroad, 144 Mo. 170; Houck v. Cape Girárdeau Water Works, etc., Co., 215 Mo. 475.] The object of this section of the amendment is to secure harmony of decision among the several Courts of Appeals with each other and with this court. [Rodgers v. Insurance Co., 186 Mo. 248.] This limitation (if in truth it is any limitation of the precise point under discussion) being kept in mind and applied, if the facts warrant, it is, we think, reasonably certain that the matter of determining whether or not there is a real conflict is not left with this court even, but remains with any one of the several judges of the courts of appeals, or with any two, or the whole of such latter court. [Rodgers v. Ins. Co., supra; State ex rel. v. Rombauer, 140 Mo. 121.] In the case of Clark v. Railroad, 179 Mo. 66, the identical point was raised on a motion to remand; that is, it was urged in that case "that an analysis of the cases with which the decision of the Court of Appeals in this case was deemed to conflict shows that no such conflict exists." After stating the point of contention, MARSHALL, J., speaking for this court, in the Clark case, supra, thus continues: "But this motion must be overruled, because the jurisdiction of this court in such cases does not depend upon the fact that there is in reality any such conflict, but depends solely upon the fact that one of the judges of the Court of Appeals deemed such conflict to exist. This court may be fully satisfied that there is no such conflict, but it cannot remand the case, because the Constitution makes it the duty of this court, in such cases, to rehear and determine the cause as in case of jurisdiction obtained by ordinary appellate process."

In the more recent case of State v. Clinkenbeard, 232 Mo. l. c. 542, KENNISH, J., cites with approval the Clark case, supra, adding that "it is not an open ques-

tion in this court as to *whether such conflict does in fact exist,* but this court must rehear and determine the same 'as in the case of jurisdiction obtained by ordinary appellate process.' "

We must conclude, therefore, that we have jurisdiction to hear and determine this case, just as if, in all respects, it had come up to us by appeal from the *nisi prius* court. The point is ruled against respondent.

II. We come, therefore, to the consideration of the point (a) urged by defendant: Did the trial court err in refusing to admit the depositions of the witnesses, Dr. Phelps and Dr. Christie?

Physician:
Competency:
Waiver.

Plaintiff in his examination in chief voluntarily testified as to the nature of his injuries, of the treatment given him, of the examination made of him, of the manner of bandaging his injuries and of the medicines used by the witness Dr. Elston, a member of the medical staff of the Corry hospital, who professionally attended plaintiff. Plaintiff also detailed conversations had by plaintiff with said Elston during such attendance—all with abundant, if not full, detail. At this examination made of plaintiff by said Elston there were also present said Phelps and Christie, both of whom are physicians and surgeons, residing at Corry, Pennsylvania, but neither of whom, so far as is disclosed by the record, was connected with the hospital. Dr. Elston testified for defendant, without any objection being interposed by plaintiff touching his competency as a witness. He related in detail the nature and extent of the injuries from which he found plaintiff suffering; the treatment furnished by the witness as a physician and surgeon to plaintiff, the manner of affixing bandages to plaintiff's hurts, as well as conversations had with plaintiff as to the latter's condition. Neither Dr. Christie nor Dr. Phelps was present in person, but defendant

having taken their depositions, offered same upon the trial. To the offering of said depositions plaintiff interposed the objection that the witnesses were not competent by reason of the statutory privilege. This objection being sustained, defendant saved its exceptions.

No point is made touching whether Doctors Christie and Phelps fall, under the facts, within the category of those to whom the statutory privilege applies; it seems to be tacitly conceded by appellant that these physicians were within the rule. Implied waiver arising from the facts, is alone relied upon. From the language of our statute, as well as from the trend of decision, we deem it plain that these physicians were incompetent, unless from the facts implied waiver may be deduced.

We append the applicable clause of our statute, as illustrating this view, as well as for purposes of pertinency hereafter, in this decision to be developed:

"Sec. 6362. The following persons shall be incompetent to testify . . . a physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional capacity, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon."

It will be noted that there is no provision touching waiver, or any method of express waiver, noted in this statute. Analyzing this clause, we see that all that is required is that the information be obtained by the physician while attending the patient in a professional capacity (thus *excluding* the necessity for the existence of an express or even implied contractual relation for hire, and *including* all cases, where from the nature of the services intended, or rendered, the relation of physician and patient arises). The information must be acquired while attending the patient in a professional capacity (thus *excluding* informa-

tion obtained by a physician upon a call upon his patient in a non-professional capacity—e. g., as upon a social call, or a call upon other than professional business). And the information obtained in the capacity and under the circumstances above set forth, must be such as is necessary to enable the physician to prescribe (thus *excluding,* and rendering competent, facts *dehors,* and not cognate to, the patient's injuries and diseases).

The incompetency of a physician to testify rests solely in statutory enactment. It was unknown at common law, where the rule was, that whatever silence might be enjoined upon the physician outside of a court of law by the ethics of his profession, that yet, within a court of law, he must unbosom himself of all facts within his knowledge touching the matter under inquiry, however obtained, present other requisites of admissibility.

Not all of the States, perhaps a bare majority only, have such a statute. It will not avail to say that we are bound to a hard-and-fast construction of our statute—that it is to us an iron-bound law of the Medes and the Persians, eternally unchangeable—and that we cannot by construction engraft upon it a single abatement in jot or tittle, by invoking the doctrine of waiver, because, forsooth, there are no waivers or provisos therein expressly written. We have, as has every civilized court where the statute exists, already engrafted, by construction, waivers upon it, which are now so well-settled as not to admit of question or quibble; (e. g., the patient may waive the privilege by calling his physician as a witness; the insured may waive the privilege, in any subsequent action, by contract in the policy of insurance). Other waivers, not so well-settled, but well decided and resting on the soundest logic and reasoning are (a) that if a physician to a patient-party in an action, be called in the first trial by the adverse side and be allowed to testify

without objection, then such act is a waiver of objection in any subsequent trial. [Elliott v. Kansas City, 198 Mo. 593.] (b) If the adverse side examine the physician of plaintiff as to the fact of treatment, cross-examination by patient's attorney as to the patient's condition, operates as a waiver. [Sov. Camp. W. O. W. v. Grandon, 64 Neb. 39.] (c) By failing to object to the question, the answer to which would involve disclosures of privileged communication between the physician and himself, the patient waives the privilege. [Johnson v. Johnson, 14 Wend. (N. Y.) 637; Lincoln v. City of Detroit, 101 Mich. 245; Lissak v. Crocker Estate Co., 119 Cal. 442; Deutschmann v. Railroad, 84 N. Y. Supp. 887.] And it has been said that it is too late to object if the question has already been answered, that a motion to strike out the answer will not lie (Briesenmeister v. Knights of Pythias, 81 Mich. 525), and (d) by himself giving in evidence voluntarily, the facts and nature of his ills and the communications had with and acts done by his physician in treating him, the patient waives his privilege to object. [Lane v. Boicourt, 128 Ind. 420.] Waiver, urged as arising in the manner and upon the facts last stated, is the phase, among others, most nearly involved in this case.

"The privilege," says Wigmore, "may be waived, like all other privileges. It is astonishing to find that this question could ever have been regarded as debatable. Nothing but a confusion of fundamental ideas could ever create any doubt." [4 Wigmore on Ev., sec. 2388.]

"The right of waiving a privilege must be as broad as the privilege itself," says our own court. [Blair v. Railroad, 89 Mo. 334; Davenport v. Hannibal, 108 Mo. 471; Thompson v. Ish, 99 Mo. 160; Carrington v. St. Louis, 89 Mo. 208.] It would seem, in reviewing the authorities, that much of our own difficulty in harmonizing holdings, has arisen from our ef-

forts, and the efforts of other courts as well, to follow
the holdings of the New York courts, which however,
touching the matter of waiver, are "cabin'd, cribb'd,
confined," by their statute (section 836, N. Y. Code
of Civ. Proc.), which provides that the privilege
granted to physicians *of not testifying* shall apply un-
less its provisions *"are expressly waived* on the trial
or examination, by the person confessing, the patient,
or the client." We conclude then that indubitably, the
privilege of not testifying as granted to a physician by
our statute, is a privilege inuring alone to the patient,
which the patient may waive either expressly, or by
implication. ·

In the concrete case at bar three alleged facts of
waiver appear, (a) Dr. Elston was called by, and testi-
fied for defendant fully, and in all its details, to his
conversations with; and treatment of the plaintiff Ep-
stein, without any objection by the said plaintiff, and
(b) plaintiff Epstein, in his own testimony in the case,
testifying for himself, in his examination in chief, vol-
untarily related fully and in detail, his consultations
with, communications to and examination and treat-
ment by, his said physician Elston, and (c) plaintiff
called his own physician, Golland, who related all the
facts of his ailments, and detailed the treatment there-
of. As we have seen, the precise point in this case is:
Is the testimony of Dr. Christie and Dr. Phelps, both
of whom were also present and assisting at these con-
sultations, communications, examination and treat-
ment, competent, when offered by defendant over plain-
tiff's objections. Objections of plaintiff, *nisi,* upon
the ground of this statutory privilege, were sustained.
The Court of Appeals, from which this case comes
to us, agreed with the court *nisi,* holding exclusion as
incompetent not to be error. So, then, the precise
question here is (the point involved having been eluci-
dated): Was the testimony of Christie and Phelps,
under the facts and the law, competent? If it was so

competent, such competency, we must concede, arises upon waiver by plaintiff in some wise occurring from what he said and did, or neglected to say or do; for we think these physicians, though not connected with the hospital, and inferentially only proffering aid in a great calamity for humane reasons, were yet in the shoes of those privileged by statute, absent waiver.

We think these two physicians were competent and that the court below erred in holding the contrary. Passing over for future discussion, when it shall come up, and not deciding the first ground of alleged waiver, we reach this conclusion of competency upon the ground (b) that since plaintiff had himself voluntarily gone upon the stand and in his case in chief, as a witness for himself, laid bare for lucre's sake, all of the secrets of his sick-room; since he had told and retold what Dr. Elston, his physician, said to him, and what he said to Elston; since he had told the precise nature of his alleged hurts as he said Elston found them, and since he had also voluntarily related the treatment professionally given to him by Elston, he waived the competency of other physicians also there present having knowledge of the identical facts. The sole object of the trial in hand was to reach the truth and the whole truth of the matter under inquiry. Indeed, this has been said either in jest or earnest, in cynicism or seriousness, to be one of the objects for which courts are instituted among men.

In the case at bar there is no question as to actionable negligence; the sole point of inquiry is, how much was plaintiff hurt, and how much compensation shall be paid him for his hurts. This point and this admission is even frankly conceded and written by defendant into its brief, for defendant says: *"That the wreck occurred and that plaintiff was on the wrecked train, the evidence places beyond dispute. The only question raised at the trial was as to the extent of the injuries resulting to plaintiff."* In such case, it be-

hooved plaintiff not to hide his ills and injuries, not to keep secret his ailments and disorders, not to close the doors of his sick-chambers, as by statute he was privileged to do, but to open wide all these things to the jury that they might see the truth, and seeing act, and acting, do him substantial justice. He could, if he had chosen, as he did not, himself have refused to disclose the consultations with Dr. Elston, or to testify as to the treatment given to him by this physician. He did not see fit so to protect the secrets of his bed-chamber, but on the contrary, blazoned them forth before a jury in an open, public court room (presumably crowded), hiding naught and "naught extenuating," yet when Dr. Christie and Dr. Phelps are offered by defendant to testify to these identical facts from defendant's point of view, he objects on the ground of his statutory privilege, that his physicians may not lay bare to public gaze the secrets of his ills; being those selfsame secrets, which he had in nauseous detail already related to the selfsame public, and which he had caused his physician, Golland, also, to relate. Apropos of this identical question, Wigmore says: "Certainly it is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law, when a plaintiff describes at length to the jury and a crowded court room the details of his supposed ailment and then neatly suppresses the available proof of his falsities by wielding a weapon nominally termed a privilege." [4 Wigmore on Ev., sec. 2389.]

We know of no rule of reason or logic warranting a rule at once so irrational and unphilosophical. The reason (that of keeping secret the diseases and ills of plaintiff) having failed by his own publication of all these facts, should not the rule fail also? This reason for this rule ought not to be lost to sight. It bears vitally upon the logic of this discussion, and is ably stated by MILLER, J., in Edington v. Insurance Co., 67 N. Y. l. c. 194, as note: "It is a just and useful en-

actment introduced to give protection to those who were in charge of physicians from the secrets disclosed to enable them properly to prescribe for diseases of the patient. To open the door to the disclosure of secrets revealed on the sick-bed, or when consulting a physician, would destroy confidence between the physician and the patient and, it is easy to see, might tend very much to prevent the advantages and benefits which flow from this confidential relationship." We have labored to show that we cannot and that we have not in judicial construction, stuck to the bark of the explicit statute; that waivers are engrafted upon it, which are fixed and settled in the law. Were not such acts, under the facts here, waivers? For says Wigmore, "A waiver is to be predicated, not only when the conduct indicates a plain intention to abandon the privilege, but also when the conduct (though not evincing that intention) places the claimant in such a position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege. It is not to be both a sword and a shield." [4 Wigmore on Ev., sec. 2388.]

Discussing a very similar question, differing from the point in the case at bar only in this, that the question of waiver which might be urged as arising from the permitting of Dr. Elston to testify without objection, was not in the case, BROADDUS, J., in Webb v. Metropolitan Street Railway Co., 89 Mo. App. l. c. 610, said:

"In the case at bar, the plaintiff testified to the treatment of the doctors named (whose testimony was offered and excluded), and what they treated her for. Did she by so doing virtually open the door of the sickroom and remove the shield of the statute which imposed secrecy upon her physician? Was it right to permit plaintiff to state that Dr. Fricke treated her for leucorrhea, inferentially that she did not have falling of the womb, and when it is proposed to call Dr.

Fricke to rebut the inference that he did not treat her for leucorrhea, but for falling of the womb, to allow her to invoke the shield of the statute? It was deemed necessary for plaintiff to show to the jury that she did not have falling of the womb or a predisposition to miscarry before the injury, and for that purpose she was permitted to state at what different times, prior thereto, she had been sick and how and for what disease each doctor treated her. In other words, she was telling what the doctors in effect said was the matter with her, and inferentially what was not. She had the benefit of really what they said to her as well as what they did for her, as she understood them, by her disclosures to the court and jury. She voluntarily lifted the veil of secrecy by going on the stand and testifying to the different treatments of the different doctors. She was allowed to fortify her case in this way by the silent testimony of those whose acts and words (indirectly) she invoked, but whose mouths she closed by the shield of the statute. If such be the law, it can be made destructive to the rights of third parties. There would be no safety against its evil tendencies in the hands of unscrupulous persons. That which was intended by the Legislature to hide, as with a veil, the secret and sacred confidences of the sick-room, should not be used as a snare for the judge and jury. There was a want of candor and fairness in such a course that at once challenges the sense of justice. It is a game of hide and seek, to be played by one side alone, to the utter helplessness and confusion of the other side. A sense of judicial responsibility forbids us giving our consent to a rule of law that, on its face, is so unfair and so unjust. He who invokes the statute must do so with the full and unqualified understanding that it is a shield to him and not a sword for others. That its beneficent object is to protect him in his rights and not to impair those of his adversary. We hold that the physicians, whose evidence was offered, were

competent witnesses under the facts. But we do not hold that when the patient divulges what occurred between himself and a certain physician who treated him for disease, that that would authorize the other side to call another physician who might have treated him at another and different time for the same disease.''

Again, in the case of Highfill v. Railroad, 93 Mo. App. l. c. 223, BROADDUS, J., speaking for the Kansas City Court of Appeals, said:

''The defendant called Dr. Wood as a witness . . . It is claimed by defendant that the evidence did not show that he was the plaintiff's physician and he was, therefore, a competent witness. We do not think he was a competent witness for the reason assigned, but under a recent decision of this court he was. We refer to Webb v. Railroad, 89 Mo. App. 604, wherein it was held that as the plaintiff has testified as to her treatment by certain physicians, and detailed the manner of her treatment, and what the physicians had treated her for, that they became competent witnesses by reason of the fact of the plaintiff having thereby removed the shield of the statute. In commenting on the facts, the court held that the plaintiff 'was allowed to fortify her case in this way, by the silent testimony of those whose acts and words (indirectly) she invoked, but whose mouths she closed by the shield of the statute,' and the facts in this case are somewhat similar. The plaintiff, in order to fortify his case, stated, as we have seen, that Dr. Wood examined him and found a bruise on his back, in other words, told him there was a bruise on his back. This was no insignificant fact going to support plaintiff's claim that he was injured as he alleged, and in so testifying he was telling the jury what his physician found indicating that he received a blow on the back in the region of the injury.

''The statute was enacted to hide, as with a veil, the confidences of the sick-room, from all, but when

the party comes into court and tells in his own behalf
that the physician stripped him of his clothing and ex-
posed his nakedness and told what the doctor found
upon him and where, he waived the secrecy imposed
by the statute. It is true he does not state what he
said to the physician, but he tells what the physician
said to him. It is reasonable to suppose that he told
the doctor how he was injured, because the doctor
caused him to strip himself of his clothing, and found
the bruised place on his body in the region it ought
to have been in order to correspond with plaintiff's
claim of where he was injured. The case clearly falls
within the rule of the case cited.''

The case of Mellor v. Railroad, 105 Mo. 455, cited
by appellant and re-cited by respondent, is not con-
trolling authority either for or against the point in
issue here. It is true that it is in principle authority
against the view of waiver arising from permitting
Dr. Elston to be used by defendant as a witness with-
out objection, but it does not deal with nor decide the
point vital here, as to whether a waiver arises from
the conduct of plaintiff in voluntarily detailing the con-
sultations with and treatment given him by said Els-
ton. (Indeed, the doctrine of the right of defendant
to contradict plaintiff's testimony arises herein, but
is not discussed, only given mere mention as food for
thought.) In the Mellor case, supra, the point raised,
discussed and decided was, that plaintiff by calling as
a witness one Dr. Glancie, who had lately treated his
disorders, *did not waive his right to object* to the testi-
mony of one Dr. Scott, who had been his physician
treating the identical sickness, before he employed
Glancie.

In Holloway v. Kansas City, 184 Mo. l. c. 44, BUR-
GESS, J., in discussing a point like the one now at bar,
used this language:

''That the plaintiff could not sever her privilege
and waive it in part and retain it in part, we think

clear. And if she waived it at all then it ceased to exist. That she did so waive it when she testified that Dr. Van Eman examined her, though not very thoroughly and asked her about it, and she told him, and he examined her womb and back, seems to us to be too plain for discussion, but such waiver should be restricted to such information as her doctor acquired from her while attending her in a professional character, and which information was necessary to enable him to prescribe for her as a physician, or to do some act for her as a surgeon, and it is manifest that the conversation between plaintiff and Dr. Van Eman in regard to the contemplated lawsuit, or plaintiff's doctor bill, did not come within the provision of the statute.''

It will be seen that the point fell out of the case, however, for Judge BURGESS held that the testimony rejected was not, for another reason, privileged, and was admissible on another ground. Conceding that in the setting of the case the question is *obiter*, yet the reasoning is cogent and in point.

Even in New York, where from the necessity of express waiver required by the statute of that State, we have seen the rule most harshly and stringently applied, we find in the case of Fox v. Union Turnpike Co., 59 N. Y. (App. Div.) 369, this language:

''When a patient voluntarily opens the door of the consultation room and gives a view that may have been specially arranged for the purpose, it would not be in accordance with the spirit of the statute or the interest of truth to shut the door against a view to be described by the physician, but in this case the door of the consultation room had not been opened by the plaintiff.''

In 10 Ency. of Evidence, 147, the rule is thus stated: ''By giving in evidence matters communicated between his physician and himself, a person waives his privilege as to the matters communicated.''

As authority for this general rule, *which is stated in the text without exception,* the cases of Marx v. Manhattan Railway Co., 56 Hun, 575, and Rauh v. Deutscher Verein, 51 N. Y. Supp. 985, among others already mentioned by us, are cited and relied upon. In the Marx case, supra, it was said: "The patient may keep the door of the consulation room closed, but he cannot be permitted to open it so far as to give an imperfect and erroneous view of what has taken place there, and then close the door when the actual facts are about to be disclosed. . . . In construing this legislation we must consider the object which was sought to be attained, viz.: the greatest of freedom in consultations with a physician. The reason for the rule no longer exists where the patient himself pretends to give the circumstances of the privileged interview."

In the case of Rauh v. Deutscher Verein, supra, l. c. 988, it was said:

"Did the plaintiff, by her testimony detailing the operations that were performed upon her at the hospital by the physicians, the treatment she then received, the statement of the physician as to the fact of the operation and as to the advice he gave to the patient, operate as a waiver of her privilege to exclude the testimony of the physician who performed the operation and who gave the advice? The waiver of the privilege cannot be limited to a particular purpose or a particular person, and if the plaintiff, by so testifying on her direct examination, waived this privilege, then it was competent for the physician to testify. We think it clear from principle and authority that she did. . . . If these physicians who attended her at the hospital cannot testify as to what happened at the hospital as to the operations performed and the treatment prescribed, it is clear that there is no one else that can. The condition would be that the plaintiff could testify to what she pleased as to the treatment she received without danger of contradic-

tion. If this contention of the plaintiff is sustained, the plaintiff is entirely safe in testifying to anything that it pleased her to say as to what happened to her or was done to her at the hospital, for the mouth of the only witness that could contradict her is silenced by this section of the Code cited. The reasoning of the court of appeals in the case of Morris v. Railroad, 148 N. Y. 92, applies with full force to this contention. . . . And it would appear to be equally unfair and unreasonable to allow a plaintiff—the one most interested in the recovery—to testify to what took place at the time of the examination by the physicians, or of the operations that were performed or the treatment received, and at the same time enjoin silence upon the physician. A physician, when called, may be said to be, under ordinary circumstances, a disinterested witness. His professional position and his reputation would of themselves be a pledge for his not intentionally violating his oath, and generally he would have no great object in making a false statement as to the result of his investigations, while his professional knowledge would enable him to state correctly the result of his investigations and the treatment he prescribed or the operations he performed. In the case, however, of a plaintiff, irrespective of the interest that he would have in coloring the testimony to suit his case, his lack of professional knowledge would expose him to mistakes in testifying, and would make it quite possible, with the utmost good faith on the part of the party testifying, that the testimony would be grossly misleading. It must be apparent that such a rule would work the greatest injustice, and would expose the defendant to danger on account of the fact that the rule would prevent him from examining into the truth of the plaintiff's statements. The question was presented at the late general term in this department in the case of Marx v. Railroad, 56 Hun, 575, 10 N. Y. Supp. 159, and it seems to me that the opinion

of the presiding justice is a most satisfactory solution of the question. The conclusion there stated by him seems to me to be unassailable. As therein said: 'It seems to us clear that, having thus himself gone into the privileged domain to get evidence on his own behalf, he cannot prevent the defendant from assailing such evidence by the only testimony available for that purpose.' "

Such are the holdings of the New York courts, which, it will still be borne in mind, are working uphill against a statute which requires an *express,* and not an implied, waiver of this privilege.

In Indiana it was held that testimony by plaintiff himself, of his wife, and his wife's mother, as to all that was done by defendant in the act of alleged malpractice in performing a surgical operation, constituted a waiver as to the competency of another physician who was also present. [Lane v. Boicourt, 128 Ind. 420.]

In the case of Smart v. Kansas City, 208 Mo. 162, a question similar in principle to the one involved in the case at bar was discussed at much length and with great learning. But while the principle involved in the Smart case, supra, is almost on all-fours with the one here present in the instant case, that case, upon the facts, is clearly distinguishable. In the Smart case the point urged as a waiver of the privilege under discussion was that *plaintiff had waived it by the mere fact of bringing the action,* which action was one for damages for the identical injuries for which plaintiff had been treated. In the Smart case, as similarly in the case at bar, Dr. Coffin, who performed at the City Hospital an amputation of plaintiff's leg, was called by and testified for defendant without objection, precisely as are the facts in the case at bar. Drs. Lane and Stanley, assistants in the hospital, were present and aided Dr. Coffin in performing the operation afore-

said. On the trial the testimony of Drs. Lane and Stanley, when offered by defendant, was objected to by plaintiff on the ground of privilege, and the objection sustained. *Held,* properly excluded. So far the facts in the Smart case and this one are precisely the same. But it will be noted upon an examination of the Smart case that plaintiff did not herself, as in the case at bar, undertake to fully relate the facts which transpired at the time of the operation; nor did she relate the conversation and consulations had between her and Dr. Coffin in the presence of Stanley and Lane; nor did she relate the condition of her injuries and the manner of the treatment thereof, as was done in the case at bar. Upon these facts *and upon these alone* can we distinguish the facts in the two cases. Since, however, we have in this opinion heretofore discussed the question of waiver arising from the act of the plaintiff himself voluntarily fully laying bare the secrets of his sick-chamber, and since we have not discussed the question of waiver arising merely from the institution of an action, we are able to draw a clear line of demarcation between the cases upon the facts; but *the principle is precisely the same.* In our view whenever these consulations, and these secrets of the sick-chamber are publicly upon the trial held up to view by the plaintiff himself, by his own voluntary testimony (as in the instant case), or by his offering one, out of two or more of his own physicians, or by his failure and neglect to interpose a timely objection when his physicians are offered by the adverse side, then the bar to the privilege no longer exists. [Johnson v. Johnson, supra; Lincoln v. City of Detroit, supra; Lissak v. Crocker Est. Co., supra; Deutschmann v. Third Ave. Railway Co., supra; Briesenmeister v. K. of P., supra; Hoyt v. Hoyt, 112 N. Y. 493; In re Benson, 16 N. Y. Supp. 111.] The reason for the rule has thus utterly failed, why should the rule then not also fail?

The question of waiver, thus arising—that is, as we hold it arose in the instant case—did not arise in the Smart case, when the latter case was considered in the Kansas City Court of Appeals, on the first appeal thereof; but the point fell out of the case upon the facts, apparently, and not upon the law. This we gather from the language of the learned judge, ELLI-SON, who wrote that opinion; "Defendant called another of plaintiff's physicians and asked him what was the condition of plaintiff's knee as he found it after the fall. The question was not allowed by the court. Defendant bases its claim to this evidence on the ground that plaintiff had testified to what the physicians had stated to her was the condition of the knee and thereby had estopped herself from claiming the privilege of the statute under the case of Webb v. Railroad, 89 Mo. App. 604. But the difficulty with defendant's position is that what plaintiff said as to the statement of the physician was not in answer to a question. Her statement was objected to by defendant and the answer was disclaimed by plaintiff's attorney by telling her that 'what the doctor said was not good evidence.' Defendant's counsel seemed then to be satisfied, as nothing further was said by him and no ruling asked of the court." [Smart v. Kansas City, 91 Mo. App. 586.]

From the statement of the facts contained in the Smart case when it was considered here, we also gather that the facts upon which to bottom this rule of law were still lacking. Though as stated, upon the facts and not in principle, we may distinguish this case from the Smart case, supra, yet in the light of reason and logic and justice, we can see no excuse for the continued existence of a rule which allows a patient party to pick and choose one out of many of his physicians, and to bar by his privilege others who know (and may perchance tell) the truth, a rule, the reason back of which in the setting and in the point discussed has

utterly failed, and a rule which in its application to the concrete case, subserves no useful purpose, and mayhap is but a bludgeon to beat down truth. The utter vice of it is well-stated by LAMM, J., in his separate opinion in the Smart case, supra:

"I am, furthermore, of the opinion that when Miss Smart tendered to the jury the issue as to the condition of her knee both before and after the injury (which she did) and when she withdrew the veil of professionel secrecy by introducing as a witness one out of a number of physicians who had examined her knee, and by his testimony made public the result of his investigation as to its condition, she waived her privilege of privacy and confidence as to any of her other physicians in relation to the same subject-matter. A litigant should not be allowed to pick and choose in binding and loosing—he may bind or he may loose. If he binds, well and good; but if he looses as to one of his physicians, the seal of secrecy is gone—the spell of its charm is broken as to all. May one cry secrecy! secrecy! professional confidence! when there is no secrecy and no professional confidence? As well cry, peace, peace, when there is no peace. [Jeremiah 6:14, q. v.] To hold so leaves a travesty on justice at the whimsical beck and call of a litigant. He may choose a serviceable and mellow one out of a number of physicians to fasten liability upon the defendant, and then, presto! change! exclude the testimony of those not so mellow and serviceable, to whom he has voluntarily given the same information and the same means of getting at a conclusion on the matter already uncovered by professional testimony to the jury. There is no reason in such condition of things, and where reason ends the law ends. The right to secrecy in confidential and professional matters may be likened unto salt. But what if the salt has lost its savour, wherewith may aught be salted? To my mind the time has come for us to take a step in advance and to construe

the statute to mean that when a litigant breaks the seal of professional confidence and secrecy, and waives it as to A., then by the same token it is broken and waived as to B., C. and D., who bore the same relation to him as did A."

Bench and bar almost universally concede that there is no branch of our jurisprudence in which there exist more glaring defects and discrepancies, and in which there is a more crying need of reform, than exist in our present strict and antiquated rules of evidence. All concede, bench, bar and laymen, that the attempted application of our strict, crabbed, century-old rules of evidence, in many cases to our present-day conditions of advanced thought, science and invention, is a laughable anachronism, on a parity with the 18th century blood-letting of an anaemic and denial of water to the fevered. All concede that it is high time to lop off some of the branches, which died of old age a century ago, and to let in the light by which justice may be seen and done. All concede that the application of these out-grown rules causes daily miscarriages of justice, yet withal, we hitch ourselves fast to *Stare Decisis,* and no one moves toward betterment. The way to reform these in many cases concededly bad rules, is to reform them, and the way to move toward better, wiser, more just and more logical conditions is to strike heavy-handed such antiquated rules of evidence as allow outrageous injustice to be perpetrated, in the open light of plain reason and common sense, in the name only of *Stare Decisis*!

We hold therefore upon this point that the court erred in refusing to permit Dr. Christie's and Dr. Phelps's depositions to be offered by defendant. The very minor point raised by plaintiff, that the contents of these depositions were not made known to the trial court in a sort of "offer to prove" way, and that the point is not preserved properly therefore, we pass as answering itself. For if the trial court was not

advised as to what the depositions contained, it is difficult to see how he could have held them incompetent, as he did. Do learned counsel urge upon us that the court *nisi* ruled blindly in this behalf? We think the evidence of these physicians was material, and its exclusion hurtful.

These views render it unnecessary to discuss the other point raised, i. e., as to whether there was any, or sufficient, proof of the impotency alleged, to take the case to the jury. On this point we need not now pass, but as the case is to be re-tried, we may in passing suggest that the condition urged, if it exists, ought to be capable of proof in some way not resting in ambiguous inference alone. It follows that for the error noted, the case must be reversed and remanded, and it is so ordered.

Since, however, the views expressed in this opinion by FARIS, J., in which all of this division concur, are, in principle, in conflict with the views expressed by a majority of the court In Banc in the case of Smart v. Kansas City, 208 Mo. 162, for the purpose of preventing confusion in the rules of evidence in the trials of cases in this State, and for the purpose of securing a single, certain, clear and authoritative utterance of the whole court on the points involved, we are of the opinion that this case, pursuant to the authority conferred on this division by the Constitution, should be transferred to Banc, to be there ruled on by all of the brethren; which is accordingly ordered. All concur.

## IN BANC.

PER CURIAM.—The foregoing opinion of FARIS, J., delivered in Division Number Two, reversing the judgment of the circuit court and that of the St. Louis Court of Appeals, and remanding the case, is adopted as the opinion of the Court In Banc. *Brown* and *Walker, JJ.,* concur; *Lamm, C. J.,* concurs in separate

opinion filed, in which *Graves* and *Brown, JJ.,* concur; *Woodson, J.,* dissents in opinion filed; *Bond, J.,* not sitting.

## CONCURRING OPINION.

LAMM, C. J.—I vote to concur in the opinion of my learned Brother FARIS. It but applies (not half-heartedly, but with modest thoroughness) the doctrine of "waiver" to the precise questions really in judgment. Now, waiver is a doctrine not new, anxious or unreasonable, but, *contra,* a favorite and familiar doctrine of the law, standing the supreme test of reason, experience and common sense. (Instruments which impugn or maintain all theories.) As I see it, the rule announced does not come to destroy the statute, but to fulfill the statute in its very soul and sense, that is, its true intendment and meaning. It goes without saying that *waiver* should not be applied to every case mechanically and without reference to the facts, but with just discrimination and in view of the facts of each case. So used it is constantly applied in court as a most wholesome and useful device in reaching a just end.

Physician:
Competency:
Waiver.

While some of the language of the opinion is a little broad and may have fallen as if *dum fervet opus,* yet such general language must be read with the concrete case held in judgment (State ex rel. v. St. Louis, 241 Mo. l. c. 238 *et seq.*) and, so read, it does not mean that if a litigant uses a physician as a witness, that thereby, and without more, every other physician he has ever had at other times, places or occasions, may be thereby allowed to break the seal of professional secrecy. Nor does it mean that if a litigant, saying or doing nothing of substance to lift the statutory veil of secrecy imposed upon sick-room disclosures to his physician (arising by examination, conversation or

consultation there) his physician may be allowed at the beck and call of the adverse party (and without leave or waiver by the patient-party) to himself break the virgin seal of secrecy or lift its veil.

If the privilege is personal to the party, as abundantly shown by cases cited by my brother, and is thereby held in the hollow of his hand, why may not it be waived by act, conduct, word for the time, place or occasion in hand? If once waived, must the waiver not be held to operate to an extent limited only by logic and reason? I think so. The scandals in beating down the truth arising from a too harsh and literal interpretation of this law (if unaided and unrelieved by waiver) every one of us knows by experience and observation in the court room.

Green v. Terminal Railroad Ass'n, 211 Mo. l. c. 18, in its general trend and philosophy, seems in right line with the principal opinion. It was there held, in effect, that while the statute was not to be whittled and frittered away by refinements, on one hand, neither was it to be used, on the other, as a scarecrow to frighten away the ascertainment of the truth by investigation. The following excerpt from that case will elucidate the thought in mind, to-wit:

"This statute creates a privilege unknown to the common law. [23 Am. & Eng. Ency. Law (2 Ed.), 83.] In that particular, it stands on a different foot than a similar privilege relating to an attorney and client. As shown by a table prepared by Judge Klein and inserted as a note to Gartside v. Insurance Co., 76 Mo. l. c. 452, such statute was first enacted in New York in 1828 and next in Missouri in 1835—the Missouri statute being substantially a copy of that of New York. A similar statute was adopted in Michigan in 1846 and it is not without significance that this court has levied tribute time and again on adjudications of the higher courts of those two states in interpreting our own statute. See, for example, Gartside v. Insur-

auce Co., 76 Mo. l. c. 451; Groll v. Tower, 85 Mo. l. c. 254, et seq.; Thompson v. Ish, 99 Mo. 174, et seq.

"Though in derogation of the common law, courts have not applied the rule of strict construction sometimes applied to statutes of that character. To the contrary, the right doctrine seems to be that the policy of the statute is an elevated one. It was intended to invite confidence between patient and physician and to prevent a breach of such confidence, and should be so construed as to further its life and purpose. It is obvious, the language of the statute is of such sort that its interpretation and application are troublesome. But, because the task is difficult, shall it be made easy by ignoring it? or by applying the statute automatically to every case and all information? On the one hand, it might be so construed as to fritter away the provisions of the law. On the other hand, it might be so literally construed as to work great mischief in the administration of justice. The ultimate object of every judicial inquiry is to get at the truth. Therefore, no rule of law standing in the way of getting at the truth should be loosely or mechanically applied. The application of such law must be with discrimination so that it may have the legislative effect intended for it and yet the investigation of truth be not unnecessarily thwarted." *Graves* and *Brown, JJ.,* join me in these views.

## DISSENTING OPINION.

WOODSON, J.—I dissent from the opinion written in this case by my learned associate, Judge FARIS, for the reasons to be presently stated.

But before stating those reasons, it may not be out of place to say that there is no question raised as to the incompetency of the witnesses Drs. Phelps and Christie, to testify in this case, without the plaintiff, *by implication,* waived his right to object to their incompetency. Not

Physician:
Competency:
Waiver.

only that, but the opinion of my learned associate correctly concedes, as all the authorities show, that they, under our statutes, were incompetent to testify in the case without, as stated, the plaintiff, *by implication,* waived their incompetency.

With these preliminary observations, I return to the reasons for my dissent to paragraph two of said opinion.

First. It is therein stated and held that, because the plaintiff testified fully as to his injuries and the treatment he received therefor at the hands of his physicians, he thereby, *by implication,* waived his right to object to the incompetency of his physicians to testify in the case.

Let us examine that question and reason together regarding it.

The plaintiff had the absolute and unqualified legal right to testify in his own behalf, as provided for by section 6354, Revised Statutes 1909; and he also had the undoubted legal right to object to the incompetency of the witnesses, Drs. Phelps and Christie. [Sec. 6362, R. S. 1909.] In other words, the plaintiff unquestionably possessed both of those rights, as provided for by these sections of the statutes; and the mere exercise of the former right did not destroy the latter. There is no language contained in either of those sections lending color to any such contention, and by so holding, the court must of necessity read into section 6362 a proviso, to the effect, that a patient shall not enjoy the right thereby given, if he should exercise the right given to him by said section 6354.

If it be true, that the mere fact that a person in exercising one of two absolute rights which he possesses, of necessity waives the other, then the law is a snare and a fraud to catch and outrage the unwary, by declaring unto him that he has certain rights, but if he dares exercise one of them, he thereby destroys the other.

With all due regard for the opinion of my learned associate, such a doctrine is unsound and vicious, both in principle and practice, and never had any real foundation whatever upon which to stand, except the bold statement of Mr. Wigmore, in his work on evidence, which is generally recognized by both the bench and bar to be an unfair, if not a biased, treatise upon the law of evidence.

Second. Nor, in my opinion, did the plaintiff waive the incompetency of Drs. Phelps and Christie, by not objecting to the incompetency of Dr. Elston, when introduced as a witness by the defendant .

Section 6362, Revised Statutes 1909, disqualifies one and all physicians to testify as to any information acquired by him or them while attending a patient in a professional capacity, and unquestionably as a necessary corollary thereto, the patient may very properly protect that right by objecting to the testimony of any one or all of such incompetent witnesses, when offered in his case.

If that is not true, then the failure to exercise the right as to one, destroys his right as to all others.

It is not so written in the bond, and Shylock has no right legally or morally to shed one drop of blood not authorized by the patient. The statute was enacted for the benefit and protection of the patient and not for the benefit of the wrongdoer, and being remedial in character should receive a liberal construction at the hands of the court, in favor of those for whom it was designed to protect; and especially should that be true since it is common knowledge that as soon as an accident of the character in question occurs, the injured (strangers in a strange land, knowing no one, and perhaps so injured that they are incapacitated from selecting a doctor) are, as a rule, without their consent, and often without their knowledge, placed in the care and control of physicians of the wrongdoer.

If under such conditions, the injured party cannot testify in his own behalf or call his own family physician to testify as to the character and extent of his injuries, without waiving all his rights to object to the testimony of the horde of physicians and nurses who attend him without his consent, employed by the wrongdoer, then a trial under such conditions would be a farce, and the law would be a travesty upon right and justice, for the obvious reason that, if neither he nor his family physician testify as to the character and extent of his injuries, the jury could not ascertain the injuries sustained, nor assess the proper amount of damages therefor.

A trial conducted in such a manner, of course, would inevitably result in a verdict in favor of the defendant, regardless of the extent of the injuries received, and probably he would fare no better if he should call the physicians and nurses furnished him by his adversary, the wrongdoer. From this, it is seen that the plaintiff would have but one other alternative, and that would be to testify in his own behalf and call his own physicians, and *thereby* according to the majority opinion, *force himself to waive his rights to object to the testimony of incompetent witnesses.*

Can that be the law? The mere statement of the proposition answers the question in the negative.

Third. It should be borne in mind that many persons injured suffer from ailments not due to the injury inflicted, and which are wholly immaterial in a trial regarding the latter, yet where is the physician, not of the plaintiff's own choosing, who would sacredly protect his rights in that regard, by concealing said ailments while testifying against him upon the witness stand? The answer is, Where! Oh where!

Fourth. It should also be borne in mind that Dr. Elston was not introduced as a witness in the case by the plaintiff, but he was called by the defendant, in plain violation of section 6362, Revised Statutes 1909,

and simply because counsel for plaintiff, intentionally or through inadvertence, failed to object to that illegal testimony, it is gravely contended and here held by the majority opinion, that because of the commission of that illegal act on the part of defendant, without protest from plaintiff, the former thereafter had the *legal right to continue the commission of similar illegal acts,* namely, the introduction of other incompetent witnesses, Drs. Phelps and Christie.

Moreover, a person might have no objection whatever to a particular physician, as Dr. Elston, testifying against him, but might have serious objection to many others doing so, especially when they are not of his selection, and unknown to him, but chosen by his adversary.

My learned associate, in my opinion, has unwittingly fallen into the error of Mr. Wigmore, whose work on evidence is far better known for boldness of statement than for the soundness of the propositions he advocates.

The only difference between this case and the case of Smart v. Kansas City, 208 Mo. 162, cited in the majority opinion is, that in that case counsel for the city contended, as was stated by Mr. Wigmore, that the mere bringing of a suit for personal injuries, waives all rights to object to this class of incompetent witnesses, while here, it is contended that the mere fact that the plaintiff undertook to prove the allegations of his petition, he thereby waived his statutory right to object to this class of disqualified witnesses.

The construction placed upon these sections by the majority opinion utterly abrogates section 6362, in letter and spirit; and I dare say that if adhered to, no case can possibly arise wherein the patient plaintiff can avail himself of the right guaranteed to him by said section 6362. This ruling of the court is as complete a repeal of that section of the statute, as if the Legislature had repealed it by an express enactment.

This ruling clearly violates the old axiom, *"Jus dicere, et non dare."*

The courts of the country are prone to amend or repeal statutes when they seem unjust or unwise in operation. This conduct of the courts is, and always has been, one of the greatest evils with which society has had to deal; and experience has taught us that there is no way to control the same, and for that reason the courts themselves should be exceedingly cautious in construing statutes and constitutional provisions.

This is a clear case of a distinction without a difference; and if the Smart case was correctly ruled, which as to this point was by the unanimous court, then this one is erroneously ruled, and *vice versa.*

I, therefore, dissent as to paragraph two of the majority opinion, and as to the result reached therein.